[Cite as *State v. Dixon*, 2022-Ohio-4454.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
HOCKING COUNTY

State of Ohio,                          :       Case No. 21CA10

    Plaintiff-Appellee,             :

    v.                              :       <u>DECISION AND</u>
                                                                  <u>JUDGMENT ENTRY</u>

Michael Dixon,                          :

    Defendant-Appellant.            :       **RELEASED 12/09/2022**

<u>APPEARANCES</u>:

Steven H. Eckstein, Washington Court House, Ohio for appellant.

David Yost, Ohio Attorney General, and Andrea K. Boyd, Special Prosecuting Attorney, Columbus, Ohio, for appellee.

Hess, J.

**{¶1}** Michael Dixon appeals his convictions for murder, felonious assault, tampering with evidence, gross abuse of a corpse, and engaging in a pattern of corrupt activity. Dixon contends that the trial court erred when it: (1) denied his request to provide a jury instruction on voluntary manslaughter; (2) denied his request to provide a jury instruction on the defense of others; and (3) included the duty to retreat in its jury instruction on self-defense. He also contends that his counsel rendered ineffective assistance for failing to object to the duty to retreat instruction.

**{¶2}** We find that the trial court did not abuse its discretion when it denied Dixon's request for a jury instruction on voluntary manslaughter. There was no objective evidence from which a jury could have reasonably found that Dixon acted under the influence of "sudden passion" or a "sudden fit of rage." Evidence that Dixon feared for his safety or

the safety of another does not constitute "sudden passion" or "fit of rage" as contemplated by the voluntary manslaughter statute. Similarly, the trial court did not abuse its discretion when it denied his request to instruct the jury on defense of others. There was no evidence that Dixon's adult daughter was in imminent danger of death or great bodily harm. She had not been threatened and was in a separate room in the house at the time Dixon shot the victim. As for the duty to retreat, Dixon invited any error the trial court made concerning the duty to retreat because he submitted a self-defense jury instruction that included a duty to retreat. And, we find no plain error because Dixon cannot show the outcome of the proceeding would have been different. Finally, Dixon's trial counsel did not provide ineffective assistance for failing to object to the provision in the self-defense jury instruction that included a duty to retreat. Dixon was not in his residence, nor was he in a place he lawfully had a right to be. Therefore, Dixon had a duty to retreat. Thus, Dixon cannot show that his counsel's performance was deficient for failing to object to the duty to retreat instruction.

{¶3}    We overrule Dixon's assignments of error and affirm the judgment.

## I. PROCEDURAL HISTORY

{¶4}    In October 2020, the Hocking County Grand Jury indicted Dixon on two counts of murder in violation of R.C. 2903.02(A) and (B), and one count of felonious assault, a second-degree felony, in violation of R.C. 2903.11(A)(1). All three counts included a firearm specification under R.C. 2941.145(A). The grand jury also indicted Dixon on seven counts of tampering with evidence, a third-degree felony, in violation of R.C. 2921.12(A)(1), one count of gross abuse of a corpse, a fifth-degree felony, in violation of R.C. 2927.01(B), sexual battery, a third-degree felony, in violation of R.C.

2907.03(A)(5), and engaging in a pattern of corrupt activity, a first-degree felony, in violation of R.C. 2923.32(A)(1). Dixon pleaded not guilty and the case proceeded to trial. The parties presented the following evidence.

{¶5}    James Whitaker was shot and killed in his home in the early morning hours on July 5, 2020. Michael Dixon eventually confessed to doing it. Dixon, an admitted methamphetamine ("meth") user, had been staying at Whitaker's house for about two years prior to the shooting. After he shot Whitaker, he dragged his body to a burn pit on Whitaker's property, torched it, and tended an on-going fire by raking it for the next 10 to 15 days, adding fuel, tires, trash, and whatever would burn. Dixon continued to live in Whitaker's house for about three weeks after he killed him. He left only after Whitaker's family came out to investigate Whitaker's disappearance and ordered him to leave. Dixon admitted that he told Whitaker's friends, family members, and law enforcement several different, ever-evolving lies about Whitaker's disappearance. At first Dixon feigned ignorance and claimed to know nothing about Whitaker's disappearance. Dixon also suggested Whitaker may have committed suicide by throwing himself into a well. He told law enforcement that he had searched the surrounding property looking for Whitaker. Dixon concocted a story about a struggle over a gun during which Whitaker accidently shot himself in the face. Dixon finally settled on a self-defense version of events.

{¶6}    Law enforcement became involved after Whitaker's family filed a missing person report in late July 2020. Sean Champ, Hocking County Sheriff Lieutenant, testified that on July 25, 2020, he went out to James Whitaker's house. James Whitaker's mother, Diana, and his daughter, Julie, were there with several other people. Whitaker's family had contacted the Hocking County Sheriff's Office to report Whitaker as a missing person.

Diana told Lt. Champ that she last talked with her son by telephone on July 3, 2020 and neither she nor any of the other family members had heard from him since. Julie explained that she had received a photograph of a suspicious suicide note that was allegedly written by her father, but it was not in his handwriting. Julie gave Lt. Champ a letter showing James Whitaker's handwriting for a handwriting comparison. Julie also told Lt. Champ that when she arrived at her father's house, Michael Dixon and Dixon's adult daughter, Melody, were there. Michael Dixon had been living there with James for about 18 months, on and off, but had loaded up a vehicle and left when Julie contacted the sheriff's office. Lt. Champ inspected the premises and documented it with photographs.

{¶7} Julie Whitaker testified that in the evening of July 11, 2020, her grandmother, Diana, called her. As a result of the phone call, Julie contacted one of her father's neighbors and one of her sisters to try to locate her father without success. Julie and her friend, Keith Strickland, and Julie's grandmother, Diana, drove to Hocking County where they picked up two more of Julie's friends, who were also Whitaker's neighbors, and went to her father's house. When she arrived at her father's house, she saw Michael Dixon, whom she knew, and his adult daughter, Melody, whom she had heard about from talking with Keith Strickland. Julie knew that Dixon had been living with her father for approximately 18 months. Julie testified that she asked Dixon where her father was and he told her he did not know. Whitaker had taken off somewhere but he did not know where.

{¶8} Julie looked around the house and saw that a lot of her father's things were missing; his "personal effects" were gone. Dixon told her that Whitaker had taken it all with him. Julie testified that Dixon told her he was in the basement when Whitaker left.

However, her father did not have an operable vehicle. When she asked Dixon who Whitaker left with and how he left, Dixon told her he just took off walking. Julie asked Dixon why Dixon had not contacted her when her father had just up and left without explanation and Dixon told her, "I don't know." Julie testified, "And then I realized my dad's TV was gone * * * I said where the fuck is my dad's TV, but way louder because I was pretty upset at that point * * *." Julie testified that the TV was a brand new 60-inch flatscreen TV. Dixon told her that her father took it with him, at which point Julie became very angry. Julie said she was angry because while Dixon was telling her he did not witness her dad leave, "he was telling me he knew that he took off walking with all of this stuff, a 60-inch TV, a shotgun, a couple of bags, a lot of stuff for a man that's 56 years old * * * to just take off walking with * * * for three weeks." She told Dixon, "you know what? I'm done with this. The sheriff's on his way. Just get the fuck off this property and don't come back until my dad is found." Dixon's daughter Melody was sitting in a chair and Dixon looked at her and said, "don't say anything." Julie testified that her father and Dixon both smoked marijuana and did meth and she had smoked marijuana with her father in the past. Julie testified that she had received a photograph of the fake suicide note through a text message from Keith Strickland, which she turned over to law enforcement. She believed the note was fake because it was not in her father's handwriting, was not how her father spoke or wrote, and was signed "Jimbo," which was not a name her father used for himself.

{¶9} Susan Jester testified that she was James Whitaker's neighbor. Whitaker's property consisted of approximately ten wooded acres and her property was approximately six acres, a portion that ran to the north of Whitaker's property and a portion

that ran along the south end of it, in a "bookend" manner. She testified that Dixon started staying with Whitaker in December 2018. Dixon would come over and complain to Susan about Whitaker and threaten to kill him "just about every time we saw him. He always had something to complain about. But the main thing is there would be times where he would come over to our house and the first thing out of his mouth when he came inside was I'm going to kill that SOB [referring to Whitaker]. I'm going to kill that MF. And you could see the anger on his face."

{¶10} Susan Jester testified that on the night of July 4, 2020 at approximately 11 p.m., Melody Dixon came up the drive and asked if she could buy some gas. She was approximately six to seven feet away from Susan and had on a white dress with what appeared to be a large blood spot on it. Susan testified that she did not give Melody gas. Susan was "way beyond frustration" with Michael Dixon because he had not done the work or provided equipment on a project for which she had already paid him. Susan testified that she had interactions with Michael Dixon between July 4 and July 26, 2020 during which she asked Dixon about Whitaker's whereabouts. Dixon told her that he just took off.

{¶11} Edwin "Al" Jester, Susan Jester's husband, testified that he had known James Whitaker for approximately 43 years; the two met in middle school. Al testified that Whitaker was a good friend, avid hunter, fisherman, and bow hunter. Al testified that Whitaker's wife died in 2017 and about two years later Dixon started staying at Whitaker's. Al testified that Dixon and Whitaker argued and Dixon told Al more than once that "I'll kill the MF" referring to Whitaker. Al also testified that Melody came up to his house on July 4, 2020, in what appeared to be a blood-stained dress, seeking to buy gas, but he did not

have any to give her. Al testified that between July 4, 2020 and July 26, 2020 he spoke with Dixon on about three or four occasions. Each time he asked if Whitaker was around and Dixon told him no.

{¶12} Jeff Amerine, a neighbor and friend of Whitaker's, testified that Dixon sold him a 60-inch Samsung TV set for $100 out of Whitaker's house, but that Dixon claimed he owned. Amerine turned it over to the police when they came to investigate it.

{¶13} Keith Strickland testified that he knew Whitaker and his family for years. Strickland frequently used Whitaker's garage to work on his car. Strickland said he met Dixon at the end of 2018 when Dixon starting staying at Whitaker's place. Dixon's adult daughter Melody moved in about four to six months prior to Whitaker's disappearance. Whitaker helped Dixon by purchasing food and cigarettes for him and providing shelter. Strickland testified that he tried to get Whitaker to kick Dixon out of the house because Strickland believed that Dixon was having sexual relations with Melody. Strickland said that on some occasions while he was over at Whitaker's, Dixon and his daughter would go downstairs together and then Strickland would hear "sounds of intimacy" coming from downstairs. Strickland testified that on the afternoon of July 4, 2020, he went to Whitaker's house to work on his car. Strickland admitted he uses meth and had used meth with Whitaker and Dixon in the past. Both Whitaker and Dixon helped Strickland work on his car that day and all three of them snorted about three tenths of a gram of meth. Strickland said that meth makes Whitaker "a little more hyper" – similar to the way it affects Strickland. It does not make Whitaker more violent and Strickland never saw Whitaker pull a gun on anyone at anytime, on meth or not on meth. Strickland estimated that the amount of meth he took that day would have affected him for approximately two hours.

Strickland said he left Whitaker's house at approximately 10 or 11 p.m. on July 4th and did not notice anything remarkable about the interaction between Whitaker and Dixon before he left that evening. The following afternoon, on July 5th, Strickland returned to Whitaker's house to continue working on his car. He did not see Whitaker around and asked Dixon about him. Dixon told him that when he woke up that morning, Whitaker "was gone" and had taken his shotgun with him. Strickland said he could not remember if he went inside Whitaker's house that day, but if he did it would have been only for a few minutes to sit down in the living room.

{¶14} Strickland testified that between July 5th and July 25th, he went over to Whitaker's house numerous times to work on his car and always asked about Whitaker's whereabouts. Dixon always denied knowing anything about it. Melody would sometimes be there when Strickland asked Dixon about Whitaker's whereabouts, but Melody did not offer much input. At no time did either Dixon or Melody explain that Dixon killed Whitaker in self-defense. However, one day Dixon approached Strickland when Strickland was out working on his car in Whitaker's garage and showed him what might have been a suicide note written on three separate pieces of paper. Dixon told Whitaker he found it in a pile of clothes.  Strickland read through the note and "figured it was crap because that's not Jimmy's writing. And I took some pictures of it, of all three pages." Strickland said he did not believe it was Whitaker's handwriting and it was signed "Jimbo," and Whitaker does not refer to himself as "Jimbo." Strickland also said that during the time period between July 5th and July 25th, Dixon asked him to help move a refrigerator and a shelf in the kitchen to "tidy up" the area. Strickland thought Dixon's motive in moving things was to tidy up and to find things in the clutter that was lying around.  Strickland also helped Dixon

move stuff closer towards the burn pit, and then Dixon would finish carrying the items out to the burn pit. At the time, Strickland did not get the sense that Dixon was hiding something by tidying up. Strickland testified that sometime after July 5th, Melody made a pass at him and "made an offer to have sex, essentially" by asking him "why don't you stay and we can have some fun." He said Dixon was in the basement when it happened and came upstairs pissed off, "grabbed the .22," and walked over to the door and shot it out the door a couple of times. Strickland said "it was loud as all get out" and he took that as a threat, "Is firing a gun around someone normal – it's a threat to me."

{¶15} Strickland testified that a few days before Whitaker's daughter, Julie, and mother, Diana, came down on July 25th, Julie had contacted Strickland to ask if he knew anything about her father's whereabouts. Strickland went with Julie and Diana to Whitaker's house. They stopped and two other friends joined them so there were five people who went to Whitaker's house on July 25th to confront Dixon and figure out what happened to Whitaker. Julie Whitaker asked Dixon where her father and his things were. Dixon said he and Melody had not seen him. Strickland noticed the 60-inch TV was still in Whitaker's house on July 5th, but when he was there with Julie and Diana on July 25th, the TV was gone. Neither Dixon nor Melody told any of them that Dixon had killed Whitaker in self-defense.

{¶16} John Dixon, Michael Dixon's brother, testified that he lives with his mother and stepfather in the family home that he and Michael grew up in. Because it was the family home, Michael had the ability to come and go from the home at will. John Dixon testified that Michael asked to borrow his gun to go hunting. John thought this was curious because Michael had plenty of other guns and Whitaker also had guns. John did not see

the gun again until about a month later. Michael had returned the gun and placed it under John's daughter's bed. When John found it, he placed it in a garbage bag and put it in the trunk of his car. When law enforcement arrived to execute a search warrant, John turned over the gun to them. John testified that he met Whitaker after Michael started staying with him. John testified that he was out at Whitaker's garage in May or June of 2020 helping Michael work on his car. Whitaker came out, yelling and pointing a gun at John, shouting, "get off his property or he would shoot me." John said this was not like Whitaker because, "usually he was great. I mean, welcoming, friendly." John believed that Whitaker acted that way because he thought John was trying to steal from him.

{¶17} Joseph Kinneer, Detective for Hocking County Sheriff's Office, assisted in the search for James Whitaker. Detective Kinneer eventually arrested Michael Dixon, issued a Miranda warning, and interviewed Dixon about Whitaker's disappearance. Dixon claimed he did not know anything. However, Dixon told Detective Kinneer that Whitaker had talked about a well and a rock structure in the woods and that Whitaker had told Dixon that Whitaker could walk off and make sure nobody would ever find him by falling into the well. In a second interview, Dixon told Detective Kinneer that Whitaker's shotgun was missing. Dixon again told Detective Kinneer that Whitaker had threatened to commit suicide by dropping himself into a well so that nobody would ever be able to find him. Detective Kinneer testified that he had spent the entire previous day searching the area down over the hill from Whitaker's property and did not see anything like what Dixon had described to him. Dixon told Detective Kinneer that it was possible that Whitaker just did not want to be found. Dixon also told Detective Kinneer about a possible suicide note that Whitaker left behind. Detective Kinneer testified that Dixon started to become emotional

so he stopped interviewing him and allowed Lt. Ed Downs to take over the interview. Dixon explained to Lt. Downs that there was an accidental shooting involving Whitaker's Remington 1100 and Dixon had put the firearm in the burn pit and burned it. However, Detective Kinneer discovered that this was a lie. Law enforcement recovered that firearm from an individual who had purchased it from Dixon. Dixon also stated that he burned the TV, but, in fact, Dixon sold it to Jeff Amerine. Dixon told the detectives that Whitaker attempted to grab Melody while pointing a gun at Dixon, he and Whitaker struggled with the gun, and it went off and killed Whitaker. However, later Dixon changed that story to one in which both Whitaker and Dixon had firearms.

{¶18} Several law enforcement officials testified about the process of excavating and photographing the burn pit. While they dug through the layers of debris, they uncovered bone fragments, which they wrapped individually and placed in small boxes. The bones were sent to the Ohio Bureau of Criminal Investigation where they were compared against DNA provided by Whitaker's mother, Diana, and determined to be the remains of her biological child.

{¶19} Dustin Robison, Detective Lieutenant with Hocking County Sheriff's Office, testified that during Dixon's interviews, he gave different stories that were inconsistent with the evidence. For example, Dixon told law enforcement that he had placed the TV and gun in the burn pit but, after they confronted him with the fact that they did not find the TV or gun there, he changed his story and told them that the TV had been sold to Amerine and the gun was with his brother John Dixon. Lt. Robison participated in a walk-through of the crime scene with Dixon. He testified that Dixon had altered the crime scene by moving the refrigerator, shelving, and other items so that blood splatters were hidden.

Initially, Dixon told them that the scuffle occurred at the top of the basement stairs where the TV was. Then he changed his story and said it occurred at the back side of the kitchen. Dixon told them he used bleach and rags to clean up the scene, which was confirmed by blood smear marks that were still on the walls. Dixon told them that he loaded up Whitaker's body onto a deer sled and dragged it through the house and out to the burn pit. Lt. Robison testified that they excavated the burn pit a second time because the coroner reported that there were a number of bones still missing. After the second dig, they recovered an additional 36 partial bones that were approximately the size of a quarter up to about a foot in length.  They were unable to locate Whitaker's jawbone so they brought Dixon back out to the crime scene. Dixon told them that the only bone he removed from the burn pit was a partial jawbone, which Dixon claimed he had placed in a plastic container and stored in the basement underneath a dresser. Lt. Robison's team moved everything piece-by-piece from the basement to look through it for the jawbone, but they were never able to locate the jawbone or any teeth. Law enforcement were also provided information that Dixon might have smashed up Whitaker's teeth with a hammer to destroy them. Lt. Robison testified that the bones recovered from the burn pit had sharp cuts from a sharp instrument, but some bones also had other edges consistent with the bones being cut up by a chainsaw blade.  Lt. Robison located a chainsaw in Dixon's vehicle but the bar and blade had been removed. A chainsaw blade was found in the burn pit.

{¶20} Angela Harden, a forensic anthropologist and skeletal trauma researcher with the Injury Biomechanics Research Center at The Ohio State University analyzed bones recovered from the burn pit. She received six boxes of skeletal remains excavated from the Whitaker burn pit during August 2020. Harden testified that the bones were

fragmented and showed signs of animal scavenging. She was able to determine they were human remains of a male over the age of 35. There was evidence of blunt force trauma to the cranial fragment at or near the time of death. She also testified that some of the bones showed serrated sharp force trauma consistent with the marks made by a power saw, while other bones showed sharp force trauma without a serrated implement. She testified that exposure to thermal heat does not impact the ability to determine the class of instrument used to inflict trauma.

**{¶21}** Michael Dixon took the stand in his own defense. He testified that he had known James Whitaker for approximately 15 years and that Whitaker had been friends with Dixon's stepfather. Whitaker's wife had died and whenever Whitaker needed some work done, Dixon would help. Dixon started to live with Whitaker approximately two years before the shooting. Dixon testified that he, "didn't have really a place to stay and I started staying with him." Dixon testified that he did not pay rent initially to Whitaker but then later worked around the house in lieu of rent. Dixon testified that Whitaker was always home, the two spent about 15 to 20 hours a day together, and grew close as a result. Most of the time they got along but they would also bicker or fight, which was typical roommate bickering that never escalated beyond that. Dixon and Whitaker did meth together and Whitaker shared his prescription pain medication with Dixon. According to Dixon, on average, they did these drugs together every other day. Dixon testified that Whitaker pulled a gun on him about six different times over the time that Dixon stayed there, but Dixon could not recall any specifics about any of those occasions.

**{¶22}** Dixon said that on July 4, 2020, though he was not sure of the date, he and Melody went to get groceries and came back and the three of them had a cookout at

approximately 7 p.m. Strickland came over after the cookout to work on his car. Strickland, Dixon, and Whitaker used meth. Dixon had been doing meth for about four years. Dixon said meth keeps him up and then starts messing with his mind. Dixon testified that by July 4th, he had been up for about two to three days in a row. Dixon said that Whitaker had been doing meth to the same degree that Dixon had and that when Whitaker uses meth his behavior is "just pretty much his self." After Strickland left, Dixon and Melody went to Amerine's house at about 10 or 10:30 p.m. and stayed there until 4:30 in the morning. Dixon and Melody returned to Whitaker's house at 5:00 a.m., July 5th.

{¶23} Dixon said that when they walked in, Melody walked up the three steps from the living room to the kitchen/bathroom area to use the bathroom. Whitaker's bedroom was directly across from the bathroom. Whitaker came out of his bedroom with his Remington 1100 and told Dixon to get off his property. Dixon told Whitaker, "as soon as Melody got out of the bathroom, I would." Dixon testified that Melody was in the bathroom when Whitaker ordered him to leave. Whitaker told Dixon that "Melody was not going with [Dixon]." Dixon told Whitaker he was "full of shit" and that "I was going to get my gun." Dixon went to the basement, got his Winchester 1400, and went back up the stairs. "When I got back to the top of the steps I could see the top part of his head and I shot him." Dixon was asked, "Does anything happen in-between then?" and Dixon responded, "I don't believe so." Dixon testified that he did not hear Whitaker say anything to Melody and he did not hear anything else. When asked "When you got up the stairs, what made you feel at that point it was necessary to shoot?" Dixon responded, "I'm really not sure." Dixon's attorney asked, "Okay. So did you hear anything that would've made you think that your life was in danger?" to which Dixon replied, "I heard the safety on his gun go - - click off."

After he heard Whitaker click the safety off, Dixon immediately shot Whitaker in the eye. Whitaker fell against the refrigerator. By that point, Melody was out of the bathroom and crouched on the floor nearby. Dixon told Melody to go to the basement. Dixon got out a deer sled, put Whitaker's body on it, pulled it out to the burn pit, put brush around the body, and went back to the house to rest. Dixon testified that he burned Whitaker's body to "try to cover it up * * * I was on meth." Dixon used fuel as an accelerant and piled tires, trash, and whatever would burn and kept the fire burning for 10 to 15 days by raking the body and the various fuel sources. Dixon denied using sharp or serrated cutting tools to cut up Whitaker's body into pieces. Dixon testified that when Whitaker's daughter and mother came to Whitaker's house in late July concerned about his whereabouts, they told Dixon to leave and he and Melody got a few things and left. Dixon went to Amerine's house and left his vehicle there and eventually went to his stepfather's house, which was where law enforcement found him the next day. Dixon admitted that he made up a number of untrue stories because he was trying to cover it up and stay out of trouble. Eventually, when confronted by the officers, he finally admitted to killing Whitaker. Dixon went back to the crime scene several times with law enforcement to walk them through his version of the events. Later in his testimony, Dixon added another detail about the incident, which was that Whitaker had threatened to kill him before clicking the safety off. Dixon was asked, "Did he say that to you before you went downstairs, after you went downstairs or both?" Dixon replied, "Both." Dixon also testified that he believed Melody's life was in danger. When asked, "Why did you think her life was in danger?" Dixon responded, "There was a reason I thought that he wouldn't let her leave with me. He wanted us to leave. He should of just let us leave."

**{¶24}** A jury convicted him on all counts, except sexual battery, and the trial court sentenced him to a total prison term of 50 years to life.

## II. ASSIGNMENTS OF ERROR

**{¶25}** Dixon assigns the following errors for our review:

1. The trial court erred, in violation of the Defendant-Appellant's rights to due process and a fair trial, when it denied the Defendant-Appellant's motion to instruct the jury on the inferior offense of voluntary manslaughter. Fifth and Fourteenth Amendments, United States Constitution; Article I, Sections 10 and 16, Ohio Constitution.

2. The trial court erred in violation of the Defendant-Appellant's rights to due process and a fair trial when it denied the Defendant-Appellant's motion to instruct the jury on defense of others. Fifth and Fourteenth Amendments, United States Constitution; Article I, Sections 10 and 16, Ohio Constitution.

3. The trial court erred in including the duty to retreat in the self-defense instruction. Fifth and Fourteenth Amendments, United States Constitution; Article I, Sections 10 and 16, Ohio Constitution.

4. Trial counsel rendered ineffective assistance in violation of Defendant-Appellant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 10 and 16, of the Ohio Constitution.

## III. LAW AND ANALYSIS

### A. Jury Instruction on Voluntary Manslaughter

**{¶26}** In his first assignment of error, Dixon contends that the trial court erred when it denied his request to instruct the jury on the inferior offense of voluntary manslaughter. He argues that Whitaker's demand that he leave without his daughter was sufficient to establish that he was under the influence of sudden passion or in a sudden fit of rage when he shot Whitaker.

**{¶27}** We review a trial court's refusal to instruct a jury on voluntary manslaughter for an abuse of discretion. *State v. Loy*, 4th Dist. Washington No. 19CA21, 2021-Ohio-

403, ¶ 15, citing *State v. Thompson,* 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 152. "Abuse of discretion" implies that the decision was "unreasonable, arbitrary, or unconscionable." *Id.*

{¶28}     A jury may find a defendant not guilty of an offense, but guilty of an inferior degree-offense "when the indictment * * * charges an offense, including different degrees, or if other offenses are included within the offense charged * * * ." R.C. 2945.74. A person is guilty of voluntary manslaughter if the person knowingly causes the death of another "while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force." R.C. 2903.03(A). Voluntary manslaughter is an inferior-degree offense of a charge of purposeful murder because "its elements are * * * contained within the indicted offense, except for one or more additional mitigating elements * * *." *State v. Shane,* 63 Ohio St.3d 630, 632, 590 N.E.2d 272, 274 (1992).[1]

{¶29}     Before instructing the jury on voluntary manslaughter as an inferior-degree offense, the trial court must conduct an inquiry into the mitigating circumstances of provocation which includes "both objective and subjective components." *Id.* at 634. The court "must determine whether evidence of reasonably sufficient provocation occasioned by the victim has been presented to warrant such an instruction." *Id.* at paragraph one of the syllabus. An objective standard applies to this inquiry: "For provocation to be reasonably sufficient, it must be sufficient to arouse the passions of an ordinary person beyond the

---

[1] Although voluntary manslaughter is an inferior degree offense of purposeful murder, there is growing recognition that " '[v]oluntary manslaughter is not an inferior-degree offense to felony murder via felonious assault because its elements * * * are neither contained within nor identical to the elements of felony murder via felonious assault.' " *State v. Moody*, 12th Dist. Butler No. CA2021-05-052, 2022-Ohio-2529, ¶ 34, quoting *State v. Hawthorne,* 2020-Ohio-756, 145 N.E.3d 372, ¶ 27-33 (5th Dist.); *State v. Davis*, 9th Dist. Summit No. 25826, 2012-Ohio-1440, ¶ 23.

power of his or her control." *Id.* at 634-635. The trial court "should evaluate the evidence in the light most favorable to the defendant, without weighing the persuasiveness of the evidence." *Id.* at 637. If the objective standard is met, "the inquiry shifts to the subjective component of whether this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage." *Id.* at 634. At that point, the court must consider the " 'emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time.' " *Id.*, quoting *State v. Deem*, 40 Ohio St.3d 205, 533 N.E.2d 294 (1988), paragraph five of the syllabus.

{¶30}     The totality of the evidence in this case, when viewed in a light most favorable to Dixon, did not reasonably support both an acquittal on the charged offenses of murder and a conviction on the inferior-degree offense of voluntary manslaughter. Dixon's defense was that he shot Whitaker out of fear for his own safety. Dixon testified that he and his daughter walked into Whitaker's house at approximately 5:00 a.m. His daughter Melody went into the bathroom, and Whitaker walked out of his bedroom with a gun and told Dixon to get off his property. Dixon testified that he told Whitaker he would leave when Melody got out of the bathroom and Whitaker told him he had to leave without his daughter.  Dixon then told Whitaker he was "full of shit" and he was going to the basement to get his own gun. Dixon went to the basement, retrieved his gun, and came back up the steps.  When Dixon got to the top of the steps, he saw the top part of Whitaker's head and shot him. Dixon testified that when he shot Whitaker, he did not see Melody or know where she was. When asked what made him feel it was necessary to shoot Whitaker, Dixon responded, "I'm not really sure." His defense counsel prompted, "So did you hear anything that would've made you think that your life was in danger?" And Dixon testified, "I heard the safety on his gun

go - - click off." Although, in response to this question, Dixon did not testify that he heard Whitaker threatened to kill him, later in Dixon's direct testimony he added another factual detail that Whitaker also threatened to kill him both before he went downstairs and then again when he came back up the stairs.

**{¶31}** On cross-examination Dixon testified:

Q. Okay. So according to you, James said that he was going to shoot you. Is that right?
A. That's what he said.
Q. And then you decided to go and get your gun.
A. Yep.
Q. Okay. But you could've left, right?
A. I could have, yes.
Q. Okay, and you decided not to, correct?
A. I wasn't leaving my daughter there.
Q. Okay. But James wasn't threatening you – or your daughter. He was just threatening you according to your words.
A. Yep.
Q. So when you shot James you stated that Melody – you couldn't even see her. Is that right?
A. Yep.
Q. Okay. So you didn't even know where she was, did you?
A. No.
Q. You told your attorney during direct examination, he asked you was there something to cause you to shoot and you said no, there wasn't. Is that accurate? There wasn't anything that caused you to shoot James, was there?
A. No.

**{¶32}** There was no objective evidence from which a jury could have reasonably found that Dixon acted under the influence of "sudden passion" or a "sudden fit of rage" under the objective standard. Whitaker's demand that Dixon get off his property was not sufficient provocation. A homeowner has a right to demand that an unwanted guest leave immediately. Whitaker's conduct (if Dixon is believed and we apply a light most favorable to him) does not constitute a serious provocation that is reasonably sufficient to incite Dixon to use deadly force. Moreover, evidence that a defendant feared for the safety of himself or

another " 'does not constitute sudden passion or a fit of rage as contemplated by the voluntary manslaughter statute.' " *State v. Sudderth*, 4th Dist. Lawrence No. 07CA38, 2008-Ohio-5115, ¶ 14, quoting *State v. Harris,* 129 Ohio App.3d 527, 535, 718 N.E.2d 488 (1998); *see also State v. Hendrickson,* 4th Dist. Athens No. 08CA12, 2009-Ohio-4416, ¶ 41, quoting *State v. Mack,* 82 Ohio St.3d 198, 201, 694 N.E.2d 1328 (1998) ("Fear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage").

**{¶33}** The record does not contain evidence that Dixon acted under the influence of sudden passion or a sudden fit of rage brought on by serious provocation occasioned by the victim that was reasonably sufficient to incite the use of deadly force. Because no reasonable jury could have found Dixon not guilty of murder but guilty of voluntary manslaughter, the trial court did not err when it refused to instruct the jury on voluntary manslaughter. Accordingly, we overrule the first assignment of error.

### B. Jury Instruction on Defense of Others

**{¶34}** In his second assignment of error, Dixon contends that the trial court should have granted his request to give a jury instruction on the defense of others because he shot Whitaker to protect his daughter's life as well as his own. Even though he testified he did not know where Melody was when he came back upstairs, he argues that the house was small and it was not likely that she would have exited it in the time it took him to go to the basement to get his gun and come back up the stairs. As with our review of his first assignment of error, we review the trial court's decision not to give a defense of others instruction for abuse of discretion.

**{¶35}** "Defense of another is a variation of self-defense. Under certain circumstances, one may employ appropriate force to defend another individual against an assault. However, 'one who intervenes to help a stranger stands in the shoes of the person whom he is aiding, and if the person aided is the one at fault, then the intervenor is not justified in his use of force and is guilty of an assault.' * * * Therefore, one who claims the lawful right to act in defense of another must meet the criteria for the affirmative defense of self-defense." *State v. Belcher*, 2nd Dist. Montgomery No. 24968, 2013-Ohio-1234, ¶ 35, quoting *State v. Moss,* 10th Dist. Franklin No. 05AP–610, 2006–Ohio–1647, ¶ 13; *State v. Wenger,* 58 Ohio St.2d 336, 340, 390 N.E.2d 801 (1979).

**{¶36}** For Dixon to act in defense of Melody, the evidence must show: (1) Melody was not at fault in creating the violent situation, (2) Melody had a bona fide belief that she was in imminent danger of death or great bodily harm and that her only means of escape was the use of force, and (3) that Melody did not violate any duty to retreat or avoid the danger. *State v. Blevins*, 2019-Ohio-2744, 140 N.E.3d 27, ¶ 75 (4th Dist.).

**{¶37}** Here there was no evidence that Melody was in imminent danger of death or great bodily harm. Dixon testified that upon returning to Whitaker's house, Melody, who had moved into Whitaker's house about four months earlier, went into the bathroom. Dixon also testified that at no point did Whitaker ever threaten to harm Melody. Dixon testified that when Whitaker told him to leave, Dixon told Whitaker that he would leave when Melody got out of the bathroom. Dixon testified that Whitaker told him "Melody wasn't going with me." Dixon then went to the basement, got his gun, came up to the top of the stairs and shot Whitaker in the face. Dixon testified that at the time he shot Whitaker, he did not know where

Melody was, nor did he hear Whitaker say anything to Melody. Dixon testified he thought

Melody's life was in danger because Whitaker would not let Melody leave with him:

> Q. Did you feel Melody's life was in danger?
> A. Yes.
> Q. Okay. Why did you think her life was in danger?
> A. There was a reason I thought that he wouldn't let her leave with me. He wanted us to leave. He should of just let us leave.

On cross-examination Dixon testified that he shot Whitaker in part because he would not

let Dixon take his daughter with him:

Q. So Mr. Dixon, you stated that James – you killed James Whitaker because he wouldn't let you take your daughter with him – with you. Is that right?
A. Part of the reason, yes.
Q. Okay. Even sticking with – going with your story, isn't it true that James could have been just protecting Melody from you?
A. No.

On re-direct with prompting, Dixon again testified that the only threats Whitaker made

were to him, he did not hear Whitaker say anything to Melody, he did not know where

Melody was but he thought she was still in the bathroom, and he was concerned for her

safety because he did not know where she was.

Q. Okay. Now did you know where Melody was when you came back upstairs?
A. Not exactly, no.
Q. Not exactly? Where did you think she was?
A. I thought she was in the bathroom.
Q. Okay. Were you still concerned for her safety at that point?
A. Yes.
Q. Why were you concerned for her safety?
A. Because I didn't know where she was at.
Q. Okay. And Mr. Whitaker had gun?
A. Yes.
Q. And told you that you needed to leave without her?
A. Yes.

{¶38}    There was no evidence that Whitaker threatened Melody, aimed a gun at

her, or told Dixon that he was going to kill or cause great bodily harm to Melody. She was in

a different room in the house when Whitaker confronted Dixon and Dixon testified he did not know where she was when he shot Whitaker. Because there was no evidence the Dixon acted in defense of others, the trial court's denial of Dixon's request for a jury instruction on defense of others was not unreasonable, arbitrary, or unconscionable.

{¶39}     We overrule Dixon's second assignment of error.

### C. The Duty to Retreat

{¶40}     For his third assignment of error, Dixon contends that the trial court erred when it included the duty to retreat in the self-defense jury instruction. He argues that the legislature amended R.C. 2901.09, which identifies situations in which there is no duty to retreat, and abolished the duty to retreat if a person is in a place in which the person lawfully has a right to be. Before the amendment, a person had a duty to retreat unless the person was in their residence or in a vehicle owned by them or an immediate family member. The effective date of the amendment was April 6, 2021, which is after Dixon shot and killed Whitaker, but before his trial commenced. He argues that the legislature intended the amended version to apply to all jury instructions given on or after the April 6, 2021 effective date. Therefore, he contends the trial court erred when it included a duty to retreat in the self-defense instruction at his trial which commenced May 3, 2021.

{¶41}     Dixon concedes he failed to object to the jury instruction and forfeited all but plain error. *State v. Moore,* 2020-Ohio-4321, 158 N.E.3d 111, ¶ 16 (4th Dist.). "Under this standard, the defendant bears the burden of 'showing that but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice.' " *State v. West,* __ Ohio St.3d __,2022-Ohio-1556, __ N.E.3d__, ¶ 22, quoting *State v. Quarterman,* 140 Ohio St.3d 464, 2014-Ohio-

4034, 19 N.E.3d 900, ¶ 16. An appellate court has discretion to notice plain error and therefore is not required to correct it. *Id.*

**{¶42}** However, Dixon not only failed to object, he submitted proposed jury instructions on self-defense that included a duty to retreat and the trial court gave, almost verbatim, the self-defense jury instruction Dixon requested and then explained to the jury when the duty to retreat exists. Dixon proposed, and the trial court issued, instructions to the jury on self-defense that included the burden-shifting scheme set forth in revised R.C. 2901.05, effective March 28, 2019, in which the state must prove that he violated a duty to retreat. Therefore, he invited the alleged error he now argues the trial court made when it instructed the jury on the duty to retreat and gave an additional instruction on when the duty to retreat exists. "The doctrine of invited error specifies that a litigant may not 'take advantage of an error which he himself invited or induced.' " *State v. Sowell,* 148 Ohio St.3d 554, 2016-Ohio-8025, 71 N.E.3d 1034, ¶ 50; *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 225 (where appellant's proposed jury instructions included the language he contended was erroneous, his proposed error was overruled under the invited error doctrine); *Wray v. Frank*, 2015-Ohio-4248, 44 N.E.3d 998, ¶ 29 (4th Dist.).

> Ohio courts have held that "[i]n reviewing a claim on appeal that a jury instruction requested by the defendant and given by the trial court was reversible error, under the 'invited error doctrine,' a party may not request a jury instruction and then later complain on appeal that [the] requested instruction was given." "Any error in relation to a jury instruction specifically requested by the defense is invited, and, in order to prevent a party from inducing the trial court to commit an error and later take advantage of it on appeal, we deem any error that may have resulted from a requested instruction as being waived." (Citations omitted.)

*State v. O.A.B.*, 10th Dist. Franklin No. 18AP-384, 2020-Ohio-547, ¶ 32; *State v. Chavez*, 3d Dist. Seneca No. 13-19-05, 2020-Ohio-426, ¶ 61 (plain error analysis not required where invited error doctrine applies).

**{¶43}** Even under a plain error analysis, Dixon cannot show the outcome of the proceeding would have been different because regardless of which version of R.C. 2901.09 the trial court applied, Dixon had a duty to retreat. As we discuss below in addressing his final assignment of error, Dixon was not in his residence nor was he in a place in which he lawfully had a right to be. Thus, he is unable to show any reasonable probability that the outcome of his trial would have been different and has failed to establish the prejudice prong of the plain-error rule.

**{¶44}** We overrule Dixon's third assignment of error.

### D. Ineffective Assistance of Counsel

**{¶45}** In his final assignment of error, Dixon contends that his counsel rendered ineffective assistance because counsel failed to object to the provision in the self-defense jury instruction that included the duty to retreat.

**{¶46}** To prevail on an ineffective assistance claim, a defendant must show: "(1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 113, citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Failure to satisfy either part of the test is fatal to the claim. *See Strickland* at 697. The defendant "has the burden of proof because in Ohio, a properly licensed attorney is presumed competent." *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 62. We "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the

circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.E. 83 (1955); *State v. Moore*, 4th Dist. Pickaway No. 20CA10, 2021-Ohio-4414, ¶ 12.

**{¶47}** Again, Dixon argues that the amended version of R.C. 2901.09 should apply to all jury instructions given after the April 6, 2021 effective date. Dixon contends, "He was in his residence[,] the victim held a gun to him, threatened to kill him, and clicked off the gun safety. He did not have a duty to retreat." He argues that because he had no duty to retreat in his own residence, his counsel was ineffective for failing to object to jury instructions which included a duty to retreat.

**{¶48}** The state contends that Dixon was not in his own residence at the time of the shooting but was a guest in Whitaker's home. Dixon testified that Whitaker told him to leave the premises, but instead of leaving immediately, Dixon went to the basement, retrieved a firearm, and refused to leave unless his adult daughter left with him. Therefore, Dixon was a trespasser – not a resident – and had a duty to retreat. The state argues that because Dixon was not in his own residence and did not have a legal right to be in Whitaker's residence, he had a duty to retreat regardless of which version of R.C. 2901.09(B) the trial court applied. Therefore, Dixon's trial counsel was not ineffective for failing to object to the duty to retreat instruction.

**{¶49}** In his reply brief, Dixon concedes that Whitaker told him "to get off the property in no uncertain terms" and he told Whitaker, "as soon as Melody got out of the bathroom I would." However, Whitaker told him to leave without his daughter and Dixon told Whitaker "he was full of shit." Dixon does not argue that he had a legal right to remain because he could condition his departure upon the departure of another adult guest in the

house. He appears to concede that he was a trespasser, but that his trespass should be excused. He contends that he "faced an impossible decision * * * He could leave immediately without his daughter and see her killed or he could confront the victim and hope for the best."

{¶50}     The evidence in the record established that Dixon was not in his residence and, after Whitaker told him to leave, he was not in a place in which he lawfully had a right to be. Dixon testified that he had no place to stay and Whitaker had invited him to stay as a guest – not a tenant. Dixon helped Whitaker with house maintenance, but did not pay rent. Dixon did not introduce any lease agreement or receipts from rental payments which might have entitled him to lawful occupation of the premises as a "tenant." Dixon referred to Whitaker's residence as "Jimmy's," and answered questions referencing Whitaker's residence as "James' home," or "Mr. Whitaker's house." When Whitaker demands Dixon leave, Dixon does not object or claim a legal right to stay on the premises. Instead, when he and Melody arrived at Whitaker's house the early morning hours of July 5th, Dixon testified that "Jimmy comes out [from his bedroom], tells me to get the hell off his – well, get the fuck off his property. And I asked him what his problem is --." Dixon was asked, "So he [Whitaker] comes around and has a gun in his hand and tells you to get off the property in no uncertain terms. And what do you tell him?" Dixon responds, "I told him as soon as Melody got out of the bathroom I would."

{¶51}     Dixon later testified that after he killed Whitaker and burned his body, several of Whitaker's family members came out in search of Whitaker and told Dixon to leave. Dixon testified that when they told him to leave, he immediately gathered his things and left.

> Q. Okay. So after that happened [the burning of Whitaker's body], I believe
> the family came out, correct?

A. Yes.
Q. And they told you to leave. Is that right?
A. Yep.
Q When they told you to leave what happened?
A. I got a few things and left.
Q. * * * you didn't fight them or anything like that?
A. No.
Q. Is that accurate?
A. Yes.
Q. Okay. So when told to leave by them you just took off.
A. Yes.

On cross-examination, Dixon again confirmed his understanding that his status at

Whitaker's was that of a guest rather than tenant:

Q. And James told you to leave. Is that –
A. Yes.
Q. He told you to get out of his house.
A. Yes.
Q. And you're living there.
A. Yes.
Q. And you weren't paying rent.
A. No.

Dixon again explained on cross-examination that when Whitaker's family members

arrived and asked him to leave, he did, "Because they told me to leave. It was their dad's

property." In other words, Dixon asserted no lawful claim to occupy the premises and

had no expectation of tenancy. *See Lee v. Wallace*, 186 Ohio App.3d 18, 2010-Ohio-250,

926 N.E.2d 328, ¶ 24-29 (8th Dist.) (court rejected live-in caregiver's claim that she

acquired a tenancy in employer's home where, among other factors, she did not have an

expectation of tenancy in the home).

{¶52}     Dixon admitted he could leave without his adult daughter but chose not to.

He cites no legal authority which establishes a lawful right to remain at Whitaker's residence

after he was told explicitly to leave immediately. *See* R.C. 2911.21(A)(1)(criminal trespass);

*State v. Helman*, 7th Dist. Columbiana No. 03CO55, 2004-Ohio-4867, ¶ 10 ("If the

complainant asked the guest to leave, had the authority to ask the guest to leave, and the guest did not immediately leave the premises, then the guest was trespassing."); *State v. Gish*, 4th Dist. Athens No. 94 CA 1612, 1994 WL 693921, *1 (Dec. 1, 1994) (the owner of private property is not required to establish why he wants a defendant to leave the premises). We have already rejected his contention that he was acting in the defense of Melody.

**{¶53}** Because Dixon was not in his residence and was not in a place in which he lawfully had a right to be, Dixon had a duty to retreat regardless of which version of R.C. 2901.09(B) the trial court applied. Thus, Dixon cannot show that his counsel's performance was deficient for failing to object to the duty to retreat instruction or, that if he had made the objection, the trial court would have sustained the objection and the trial results would have been different.

**{¶54}** Additionally, the question of whether the amended version of R.C. 2901.09 should apply to his trial, even though it was not in effect at the time the offense occurred, is an unsettled question of law. Dixon cites no cases in which a court has held that the amended version of R.C. 2901.09 applies to his situation. Our research has located only one Ohio appellate district that has rendered a decision on the issue, which was decided well after Dixon's trial concluded and it does not support Dixon's argument. *See State v. Hurt*, 8th Dist. Cuyahoga No. 110732, 2022-Ohio-2039, ¶ 54-61 (former R.C. 2901.09 applied to defendant's case where offenses occurred before, but trial commenced after, April 6, 2021).[2]

---

[2] *Hurt* was decided prior to the Supreme Court of Ohio's decision in *State v. Brooks*, __Ohio St.3d__, 2022-Ohio-2478, __N.E.3d__, which held that amended R.C. 2901.05, eff. March 28, 2019, applied to all subsequent trials even when the offenses occurred prior to the effective date of the act. Though *Brooks* involved a different self-defense statute, the dissent in *Hurt* stated that *Brooks* "would arguably be

**{¶55}**    Dixon's ineffective assistance of counsel claim rests on a novel theory unsupported by existing Ohio law. " 'It is not ineffective assistance for a trial lawyer to maneuver within the existing law, declining to present untested * * * legal theories.' " *State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, ¶ 219, quoting *State v. McNeill*, 83 Ohio St.3d 438, 449, 700 N.E.2d 596 (1998); *State v. Sanders*, 92 Ohio St.3d 245, 275, 750 N.E.2d 90, 125 (2001) ("counsel had no duty to press 'untested or rejected legal theories.' *State v. McNeill* (1998), 83 Ohio St.3d 438, 449, 700 N.E.2d 596, 607").

**{¶56}**    Dixon was not in his residence or a place he lawfully had a right to be, thus he had a duty to retreat under both the prior and the amended version of R.C. 2901.09(B). Moreover, his argument that amended R.C. 2901.09 applies to his trial is an untested legal theory in this district and a rejected one in at least one other Ohio appellate district. Therefore, Dixon has failed to establish that his trial counsel was deficient in failing to object to the self-defense jury instruction that included a duty to retreat.

**{¶57}**    We overrule Dixon's fourth assignment of error.

IV. CONCLUSION

**{¶1}**    We overrule Dixon's assignments of error and affirm the judgment.

JUDGMENT AFFIRMED.

---

determinative of the retroactivity" of R.C. 2901.09. *Hurt* at ¶ 92. We express no opinion as to whether the amended version of R.C. 2901.09 applies when the offense occurred prior to, but the trial commences after, April 6, 2021. Our ruling on Dixon's third and fourth assignments of error renders that legal question moot. "An appellate court is not required to render an advisory opinion on a moot question or abstract proposition or to rule on a question of law that cannot affect matters at issue in a case." *Germanoff v. Aultman Hosp.*, 5th Dist. Stark No. 2001CA00306, 2002-Ohio-5054, ¶ 56.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED.  Appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the HOCKING COUNTY COURT OF COMMON PLEAS, to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court.  If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court


BY: _____
        Michael D. Hess, Judge



### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**