[Cite as *State v. Stevens*, 2023-Ohio-3280.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
HOCKING COUNTY

STATE OF OHIO,                          :
                                        :
    Plaintiff-Appellee,             :          Case No.  21CA9
                                        :
    v.                              :
                                        :          <u>DECISION AND JUDGMENT</u>
GERALD D. STEVENS,                      :          <u>ENTRY</u>
                                        :
    Defendant-Appellant.            :          **RELEASED 9/14/2023**

_____

<u>APPEARANCES:</u>

Felice Harris, Harris Law Firm, LLC, Columbus, Ohio, for Appellant.

Dave Yost, Ohio Attorney General, Andrea Boyd, Assistant Attorney General, Columbus, Ohio, for Appellee.

_____

Smith, P. J.

{¶1} Gerald D. "Dean" Stevens appeals the entry of the Hocking County Common Pleas Court entered October 8, 2021.  On appeal, Mr. Stevens raises four assignments of error challenging:  (1) the sufficiency of the evidence presented to convict him; (2) the alleged improper admission of evidence; (3) an alleged violation of his constitutional rights to confrontation of witnesses; and (4) an alleged ineffective assistance of counsel.  For the reasons which follow we find no merit to his assignments of error.  The judgment of the trial court is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

{¶2} On December 6, 2019, Stevens was indicted on five counts as follows:

| | |
|---|---|
| Count One: | Aggravated burglary, R.C. 2911.11(A)(1); |
| Count Two: | Burglary, R.C. 2911.12; |
| Count Three: | Burglary, R.C. 2911.12(A)(3); |
| Count Four: | Grand Theft, when the Property is a Firearm Or Dangerous Ordnance, R.C. 2913.02; |
| Count Five: | Tampering with Evidence, R.C. 2921.12(B). |

{¶3} Counts Two and Three also contain firearm specifications. The indictment against Stevens arose from criminal activities which occurred at the residence of Stevens' cousin, Robbie Davis, on or about December 26 and 27, 2013. The Davis' residence is located at 2451 Goose Creek Road. Robbie Davis resides with his wife Megan and their small children. Dean Stevens and various other family members also live in this vicinity.

{¶4} On December 10, 2019, Stevens appeared in the Hocking County Common Pleas Court and entered not guilty pleas.[1] Pretrial

---

[1] The matter was prosecuted by a special prosecutor on behalf of the Ohio Attorney General's Office. Stevens retained defense counsel. The sitting Hocking County Common Pleas Court judge recused himself and a visiting judge was assigned by the Supreme Court of Ohio.

proceedings were affected by the Covid 19 emergency.  Mr. Stevens

eventually proceeded to a jury trial on June 7, 8, and 9, of 2021.

{¶5} The State's theory of the case was that Dean Stevens sent

a "crew" of criminals, namely Brandon Allen, Shane Adkins, and Kenny

Wells, to the home of his cousin, Robbie Davis's house for the purpose of

stealing Davis's money and guns from a safe.  Jeremy Myers, the key State's

witness, was present when Stevens originated the plan and discussed it with

the crew of participants.

{¶6} On December 26, 2013, the burglary was interrupted and

Stevens' crew went to Myers' apartment to wait until they could go back and

complete the burglary.  The next day, Jeremy Myers spoke with Brandon

Allen and Stevens, both of whom told him virtually the same story

describing the events which had occurred at Davis's home on December 26

and 27, 2013.

{¶7} Jeremy Myers' testimony began with his acknowledgment of

his criminal history which included three convictions for receiving stolen

property, breaking and entering, and theft.  Myers was also charged with

burglary and theft from Robbie Davis.   As part of a plea agreement to the

burglary charge, he agreed to work with investigators and testify.  Two other

charges were dismissed.  The State agreed to defer sentencing to the judge.

{¶8} Myers testified he met Dean Stevens in 2013 through a mutual acquaintance, Shane Adkins. Adkins helped Myers sell stolen goods. Myers was also a longtime associate of Brandon Allen.

{¶9} In 2013, Jeremy Myers had arrest warrants and was hiding in Jackson County. Myers met Stevens through their mutual friend, Shane Adkins. At first, Myers stayed with Adkins and did legitimate odd jobs for Dean Stevens, such as chopping firewood, washing cars, and cutting grass. Later Stevens provided Myers an apartment for 7-8 months. Myers "bounced" between Stevens' apartment and the Jackson area.

{¶10} Myers testified after "they" became comfortable, "they" began devising ways to make money. Myers testified that he and others engaged in criminal activities at the behest of Stevens. Myers testified that Timothy Stein and he worked together as a "crew." Brandon Allen, Shane Adkins, and Kenny Wells worked together as another "crew."

{¶11} Stevens provided Myers various vehicles and phones. Stevens also purchased phones for Brandon Allen. Almost every 30-40 days Stevens provided a new phone. Myers testified the idea behind changing phones was "if you do three or four things with the same phone and then you get caught on the fifth one, then that phone right there can tie you to those

three or four too.  So, if you change the phones up often you might get caught for this one, but you're not going to get hit for the other ones."

{¶12} Myers testified about a conversation which he overheard a few days before Christmas 2013, in Dean Stevens' garage.  Myers overheard Stevens concocting a plan for Brandon Allen and his crew to break into Robbie Davis's home:

> Well, Dean finally showed up and gave me the money about the same time that Brandon showed up.  And then he also owed Brandon some money for some other things and that kind of started a little argument between them two because he could pay me but he can't pay them. And that's when they started discussing about he's got something he - - for them to do right down the street and it went from there.

{¶13} Myers continued:

> Well I was closer towards the back of the garage but I overheard the conversation.  I guess he'd been having problems with this guy for a while.  Talking about Rob. He was going to be gone.  There's a safe in there.  The money's in there and he had a bunch of guns and Dean wanted the guns.

{¶14} The plan was for the crew, consisting of Brandon Allen, Shane Adkins, and Kenny Wells, to break into Robbie Davis's home.  There was a safe containing cash and firearms.  The crew would keep the money and Stevens would get the firearms.

{¶15} Myers further testified as to Stevens' support and assistance of

the crew during the burglaries.  After the crew had initially gone onto

Davis's property, the crew showed up unexpectedly at Myers' apartment.

Myers testified that he knew the burglary, although not completed, had taken

place:

> [I]t was sometime late in that - - in the night, after 12:00 or 1:00, I'm not 100 per cent sure on the time, I'm in that apartment and they come in. That's how I know it was that three.  Before - -when the conversation went down at the garage that day there was only two of them.  But then later that night it was the three of them that came into the apartment, all right?  The neighbors at the end of the driveway or whatever it was, I guess, had called the law or whatever it is.  However, that happened, Dean ended up there before they did.  While Dean was there, he got the chip from the camera and placed a key on a waterspout for them to get back.  But he blocked the driveway, or someone blocked the driveway.  And then they went back again after everything had calmed down and cooled off and that's when they took the truck and all.

{¶16} Myers testified he talked to Stevens around 10:00 or 11:00 on

December 27th, and Stevens was "ranting and raving" and "pissed off" that

the crew did not bring him any guns.  According to Myers, Stevens told him:

> Told me that, you know, that he set them up with that and there was supposed to be this amount of money in there, which I don't remember how much it was, and the only thing he wanted out of it was the guns.  And they went in - - well, their dumb asses went in there and they got caught so he fixed that.  And then when they did it again, they didn't even bring him his guns.

{¶17} The prosecutor questioned as follows:

Prosecutor:   And he was upset because they didn't - -

A:   He didn't get - -

Prosecutor:   - - bring him the guns that they were supposed to?

A:   Yes.

Prosecutor:   All right.  Now you mentioned that Dean told you that he went into the house that night.  What did he tell you about why he went over to the house that night?

A:   Because - - he said that he went in there and he got the SD card out of the camera.

Prosecutor:   Okay.  And what did he say about that SD card?

A:   He said he broke it.

Prosecutor:   Did he tell you why he broke it?

A:   That way I guess they wouldn't get no pictures or nothing like that.

Prosecutor:   Do you remember if he told you anything about a truck key?

A:   Yeah.  It was a Ford truck key.  He stuck it on the waterspout.

Prosecutor:   You say, yeah, Ford truck key stuck on waterspout.  What do you mean by that?

A:   When they blocked the driveway or whatever it is, he  - - when he went in there he left them a key on the waterspout outside - -

Prosecutor:   So - -

A:           is what Brandon had told me.  And then I had talked to him the next day and he told me the same thing so I know that there was a key left on the waterspout.

Prosecutor: So, Brandon had told you this, but Dean had also told you that that night when he was over there, he had taken a truck key and put it outside on the waterspout in the anticipation that these guys would come back around?

A:           Yes.

Q:           And then this would help them take this truck in order to take the safe?

A:           Yes.

{¶18} Myers also reviewed State's Exhibit 3, a photograph from a deer camera on Davis's property.  This photograph was dark and showed a person facing the opposite direction.  The person was wearing a hoodie and pants.  The prosecutor asked how Myers could identify the person as Brandon Allen.  Myers testified "because of the body language.  That's just the way he walks."

{¶19} Myers' testimony further revealed that in the summer of 2014, Myers and Timothy Stein were picked up on probation violations and held in Jackson County.  While in the Jackson County jail, Detective Ed Downs, Deputy Rieder, and Major Mike Musick approached Myers and questioned him about the December 2013 burglaries at Robbie Davis's home.  The

officers asked him to wear a wire and talk to Stevens about the burglaries. Myers and Stein were released from jail. Myers testified that State's Exhibit 17 was his recorded conversation with Stevens in which the men discussed the burglaries at Davis's home. This conversation will be discussed further under Assignment of Error One.

{¶20} On cross-examination, Myers admitted that he had been stealing since he was a teenager. He also admitted that when the crew showed up at his apartment after the first burglary was interrupted, he didn't call the authorities. Myers acknowledged that pursuant to the plea agreement, he is not facing mandatory prison time. Stevens' attorney also attempted to discredit his testimony by pointing out that Myers was interviewed two to three times with law enforcement officers but he had not always mentioned the broken SD card.

{¶21} After the burglaries were completed, Myers testified Davis's truck and the safe were taken to Richland Farms where the safe was cut open. The crew took the money and guns inside the safe. Stevens never received any firearms.

{¶22} Robbie Davis began his testimony describing his close relationship with his cousin, Dean Stevens. Stevens had a "big heart," and the Stevens family were "good people." The cousins helped each other and

hunted together. Stevens helped Davis get his CDL and get into a trucking business. Davis and Stevens had purchased safes in Tennessee at the same time.

{¶23} In 2013, Robbie Davis's family celebrated Christmas at home and then traveled to Florida. The night after Christmas, Robbie Davis received a phone call from his brother Darrin Davis. Darrin told him Rick Reid had contacted him after hearing noise and dogs barking at Davis's house. Rick Reid drove to Davis's house and saw one of Davis's trucks running with the doors wide open and a trailer attached.

{¶24} Eventually at least ten people were present in Davis's home, apparently alerted by the noise and dogs as was Rick Reid. The evidence demonstrated that Tony Davis and Bernard Davis also went to Davis's home due to the sound of barking dogs. Darrin Davis contacted his sister Sherry Lowery and her husband Dave Lowery, and they both showed up to assist. Sherry Lowery testified that Frank Davis and Appellant Stevens also showed up at Davis's home, presumably to assist. The testimony also indicated a couple of unnamed neighbors, possibly now deceased, also responded.

{¶25} After Davis was alerted about the disturbance, he called his house while the aforementioned Stevens, Rick Reid, Darrin Davis, Frank and Patty Davis, Eric Smith, Sherry and Dave Lowery, Tony Davis and a

neighbor were present.  Davis testified he had a deer/trail camera in his driveway and a surveillance camera in the master bedroom.  Davis told Sherry Lowery to find the surveillance camera and to check the surveillance video.

{¶26} Davis testified he was on speakerphone and everyone could hear each other.  Davis was having the others check the house to see if things were stolen.  He told them to see if his pistol was in the sock drawer in his bedroom.  All of his other firearms were in a safe except for a pistol he had with him on vacation.

{¶27} Davis testified he installed the surveillance camera a few days before his trip.  Most of his family members knew about it, including Stevens, as they were talking on the phone while Davis installed the camera. Stevens had mentioned he would like to see the camera.  The camera's recording device was hidden under the clothes in Davis's bedroom.  When the surveillance video was found, it would not play.  Tony Davis inserted the SD card from the surveillance camera in his laptop.  Stevens attempted to play the SD card on his phone.  Neither were successful.

{¶28} Davis reported the situation to the Hocking County Sheriff's Office after everyone had walked through the house.  Davis's family talked about staying at his house, but an officer advised against this.  After the first

attempted burglary, Davis's brother parked a log truck sideways to block the driveway.

{¶29} Davis testified the next morning his brother called and said the intruders came back and stole his safe. Davis identified a photograph of his safe.[2] He kept 41 firearms in it. Davis's white Ford truck was stolen. Some of the personal items were later found in the creek. He later recovered four of his guns.

{¶30} Davis testified he did not know Brandon Allen or Jeremy Myers. He had seen Jeremy Myers once at Stevens' car lot before the robbery. Davis's deer camera picked up an image of two individuals walking toward his house. Davis's wife and young children were scared for months after the burglaries.

{¶31} On cross-examination, Davis testified that it didn't make sense that Stevens would want to steal from him. He "would not have believed it in a million years." Davis testified he was uncomfortable testifying. Even at trial, he still didn't believe that Stevens had a reason to steal from him.

{¶32} Lieutenant Brian McManaway of the Hocking County Sheriff's Office testified he responded, along with Deputy Brock Bowman, to a

---

[2]Davis testified he kept baby books, SD cards, collector items, Dale Earnhardt items, gold coins, some cash, and firearms in the safe. Davis had a collection of 1100 Remington shotguns, high-powered rifles, 870 Wingmasters, a .22 pistol, a Ruger. His wife's jewelry box containing rings, bracelets, gold and silver necklaces, and wedding ring was also stolen.

possible burglary at the Davis residence on December 27, 2013. Deputy Bowman took a report, which was State's Exhibit 23. Lt. McManaway testified that according to the report, dogs were barking about 8:45 p.m. on December 26. Tony Davis and Bernard Davis went to check on Davis's house, and one of Davis's vehicles, a truck, was backed up to a trailer. Lt. McManaway identified State's Exhibit Two, a five-page composite exhibit, showing the area of Davis's home and the homes of the other relatives living nearby.

{¶33} Lt. McManaway further testified that there was a surveillance camera inside the house and a trail camera outside. A broken SD card from the surveillance camera was collected as evidence. On cross-examination, Lt. McManaway admitted he did not collect the SD card and had to rely on the police report as to the card's actual existence. He admitted he did not take pictures or collect evidence in the matter.

{¶34} Sherry Lowry testified Robbie Davis is her older brother and Stevens is her cousin. She admitted she was uncomfortable testifying in the case because she loved both of them. On December 26, 2013 around 10:00 p.m., she was at her home, approximately six miles away, when she received a call from her brother Darrin Davis, that Robbie's house had been broken into. Someone said the security alarm had been activated.

{¶35} Sherry and her husband David took a pistol and went to Davis's house to investigate the situation. Davis's white truck was running with the door open. Sherry, David, and a neighbor walked around the house checking doors. Then they left and went to her father's house nearby to see if he had been burglarized. Stevens followed them some distance but when they went inside her father's house, Stevens indicated he was going to check in the fields. She did not know where Stevens was during this time.

{¶36} After determining Sherry's father's house was unharmed, they went back to Robbie Davis's house. Sherry checked to see if anything was missing. Sherry talked with Robbie Davis over the phone. Before Robbie left on vacation, he had installed a surveillance camera in his bedroom. Megan Davis had covered the camera underneath a stack of clothing. Eventually Sherry found the camera.

{¶37} Sherry tried to play the camera but was afraid she would erase footage. Her husband David removed the SD card. Tony Davis had a laptop and tried to play the SD card on it. When that failed Tony Davis laid the SD card on the kitchen table. Sherry testified Stevens picked up the card and tried to play it on his phone. The next time she saw the SD card on the kitchen table, it was broken.

{¶38} Sherry also testified that when they arrived at her brother's

residence, she took keys out of the cars so they could not be stolen. She placed the keys in a bowl on a Lazy Susan in the kitchen cabinet and out of sight. She testified Stevens and others were there when she placed the keys out of sight.

{¶39} Sherry testified Robbie asked Stevens to check on a pistol in a sock drawer. Stevens confirmed it was in the drawer. To her recollection, the surveillance camera was working and was not pointing upward when she left. When Sherry returned to the house the next day, the security camera was turned upward pointing to the ceiling.

{¶40} Sherry testified Frank Davis, Tony Davis, and her husband discussed staying overnight at Davis's house to watch over his property. A deputy, however, discouraged them from staying.

{¶41} On cross-examination, Sherry acknowledged that other relatives and neighbors had been to the house that night. She agreed as many as ten people, including Stevens, were present when she placed the keys out of sight and when they tried to play the SD card.

{¶42} David Lowry testified Robbie Davis is his brother-in-law. While Sherry specified that her husband and she received a phone call about the disturbance at Davis's home from her other brother Darrin at 10:00 p.m. on December 26th, David could not specify the time.

Nevertheless, he also testified that upon receiving the phone call, they left quickly and upon arrival found a black Dodge truck hooked up to a trailer, engine running, in the driveway. David, Sherry, and a neighbor checked the doors in the house and outer buildings. According to David, "nothing much seemed out of place."

{¶43} While there, Frank Davis, Ricky Reid, two neighbors possibly now deceased, another male across the road, and Dean Stevens also showed up to assist. David went down to check his father-in-law's residence and Stevens went part of the way. However, when Stevens decided to check the fields below Davis's house, he went alone.

{¶44} When David returned to Davis's house and went inside, he noticed things moved and windows unlocked. Sherry placed the car keys out of sight. Sherry found the surveillance camera under a stack of clothes. The surveillance camera was recording. Stevens checked the sock drawer and found the gun secure. David believed Stevens was there to assist, not to steal. Both parties pointed out that Davis and Stevens were relatives and good friends. Both Sherry and David Lowery, testified they were uncomfortable appearing at trial and did not want to believe that Stevens played any part in the crimes.

{¶45} David testified Frank Davis, Tony Davis, and he considered

staying around awhile to protect the place, but law enforcement officers advised them no one would likely be back. Stevens had left while the group was deciding whether or not to stay. The next day David learned the house had been burglarized again. This time, he noticed the gun safe was gone, the floor was scratched, and the house was "ransacked."

{¶46} Deputy Brock Bowman testified that on December 27, 2013, the sheriff's office received a call shortly after midnight of an attempted burglary at Robbie Davis's residence. Bowman went to the scene with Lt. McManaway. Family members advised that they were unsure anything was taken but it was believed someone had gained entrance due to the positioning of the truck in the driveway. They collected a broken SD card and a photograph from the deer camera. Deputy Bowman took various photographs at the Davis residence and authenticated them during his testimony and identified State's Exhibit 3, the photograph from the deer camera.

{¶47} Dep. Bowman testified they received a second call around 9:00 a.m. on the 27th. This time family members indicated items were missing. Deputy Bowman responded with another deputy. Family members advised that a side window to the residence was open, the gun safe was gone, and Robbie Davis's Ford truck was gone. A photograph demonstrating the

surveillance camera pointing upward led Bowman to believe it had been tampered with. Exhibit Five depicted the safe.

{¶48} Deputy Bowman also did a walk-through video showing the inside of Davis's house, Exhibit 15, which was played for the jury. Davis's stolen truck was recovered in Jackson County. Exhibit 7 depicted the truck.

{¶49} Deputy Bowman also testified he subpoenaed the phone records of Dean Stevens, Brandon Allen, Jeremy Myers, and Timothy Stein during the investigation of the Davis burglaries. Deputy Bowman identified State's Exhibit 18, a call detail record (CDR) for the period of time between December 26, 2013 and December 27, 2013. The CDR will be discussed in greater detail under Assignment of Error Two. On cross-examination, Deputy Bowman clarified that the CDR reflected only that the phone numbers were registered to the various individuals. He admitted that he could not say who was using the phones during each call.

{¶50} Deputy Bowman also identified State's Exhibit 14, a plea agreement between the State of Ohio and Brandon Allen. The agreement reflects that Allen pled guilty to burglary and attempted theft relating to the activities at Robbie Davis's house on December 26 and 27, 2013.

{¶51} At the close of trial, the State offered its exhibits, 1-18, and 23, (excluding 4, 11, and 15), without objection. These included:

1. Photos of house

2. Photos of property

3. Photo from deer cam

4. Excluded

5. Photos of safe

6. Photos of jewelry box and list of missing items

7. 21 photos of truck

8. Excluded

9. Photo of DVR monitor

10. Jeremy Myers' plea agreement

11. Excluded

12. Myers' defendant agreement[3]

13. ODNR license of Brandon Allen

14. Brandon Allen plea agreement

15. Excluded

16. Walk through video of Davis property

17. Audio recording between Myers and Stevens

18. Phone record data- CDR

---

[3] Exhibit 12, Myers' defendant agreement, is a three-page document which references the plea agreement. In the defendant's agreement, Myers promised to testify truthfully, completely, and accurately.

* * *

23. Incident Report

{¶52} After the State rested, defense counsel made a Crim.R. 29 motion which was denied. The defense offered one exhibit, Jeremy Myers' indictment, and then rested without offering further evidence. In closing argument, the State argued that Stevens' guilt by complicity to the crew's criminal activities was established through Jeremy Myers' testimony. In closing, Stevens' attorney characterized Myers' testimony as an unreliable "tall tale." The jury was instructed as follows:

> The defendant may be convicted as a principal offender or as a complicit [sic], or as to any other or all counts and specifications in the indictment. A person who is complicit with another in the commission of a criminal offense is regarded as guilty as if he personally performed every act constituting the offense. This is true even if he did not personally perform every act constituting the offense or was not physically present at the time the offense was committed. Before you can find the defendant guilty of complicity by aiding and abetting, you must find beyond a reasonable doubt that the defendant supported, assisted, encouraged, cooperated with, advised or incited the principal offender in the commission of the offense, and that the defendant shared the criminal intent of the principal offender. Such intent may be inferred from the circumstances surrounding the offense, including, but not limited to, presence, companionship and conduct before and after the offense was committed. The mere presence of the defendant at the scene of the offense is not sufficient to prove in and of itself that the defendant was an aider and abettor.

{¶53} On June 10, 2021, Stevens was convicted of Counts Two, Three, and Four along with the specifications as to Counts Two and Three. On August 16, 2021, the trial court journalized its Judgment Entry of Sentence and imposed an aggregate prison term of six years and six months. On October 8, 2021, the trial court filed a Nunc Pro Tunc Judgment Entry of Sentence.[4] Mr. Stevens has timely appealed his convictions.

## ASSIGNMENTS OF ERROR

I. THE STATE FAILED TO PRODUCE SUFFICIENT EVIDENCE TO SUSTAIN ITS CONVICTIONS IN VIOLATION OF DEAN STEVENS' RIGHT TO DUE PROCESS OF LAW GUARANTEED BY ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION AND THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

II. THE TRIAL COURT ERRED AND VIOLATED DEAN STEVENS' CONSTITUTIONAL RIGHT TO CONFRONT THE WITNESSES AGAINST HIM BY IMPROPERLY ADMITTING EVIDENCE IN VIOLATION OF THE CONFRONTATION CLAUSE OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND OHIO EVID.R. 803(6).

III. DEAN STEVENS WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY THE UNITED STATES AND OHIO CONSTITUTIONS.

---

[4]The Nunc Pro Tunc Judgment Entry of Sentence  appears to have been filed in order to correct the misidentification of Count 4 as Count 3 on the first and second pages of the first Judgment Entry of Sentence.

IV.    THE TRIAL COURT ERRED AND VIOLATED DEAN STEVENS' CONSTITUTIONAL RIGHTS TO DUE PROCESS OF LAW AND A FAIR TRIAL BY IMPROPERLY ADMITTING EVIDENCE IN VIOLATION OF OHIO EVID. R. 401, 403, AND 404.

## ASSIGNMENT OF ERROR ONE -  SUFFICIENCY OF THE EVIDENCE

{¶54} Stevens makes three arguments.  First, he contends that the evidence was insufficient to establish that he unlawfully trespassed into an occupied structure, proof of which was required to support a conviction on Count Three, Burglary.  Next, Stevens argues that the evidence was insufficient to establish that he had a firearm on or about his person or under his control as alleged in the Specification to Count Three.  Finally, Stevens also contends the evidence was not sufficient to establish that he trespassed into an occupied structure when another person was present or likely to be present as alleged in Count Two, Burglary.

## A.  STANDARD OF REVIEW

{¶55} A claim of insufficient evidence invokes a due process concern and raises the question whether the evidence is legally sufficient to support the verdict as a matter of law.  *See State v. Blevins,* 2019-Ohio-2744, 140 N.E.3d 27, at ¶18 (4th Dist.); *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).  When reviewing the sufficiency of the evidence, an

appellate court's inquiry focuses primarily upon the adequacy of the evidence; that is, whether the evidence, if believed, reasonably could support a finding of guilt beyond a reasonable doubt. *Thompkins, syllabus.* The standard of review is whether, after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. *See*, *e.g., Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781 (1979); *State v. Jenks,* 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991). Furthermore, a reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *Thompkins* at 390, 678 N.E.2d 541.

{¶56} Thus, when reviewing a sufficiency of the evidence claim, an appellate court must construe the evidence in a light most favorable to the prosecution. *See, e.g.*, *State v. Hill,* 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996); *State v. Grant,* 67 Ohio St.3d 465, 477, 620 N.E.2d 50 (1993). A reviewing court will not overturn a conviction on a sufficiency of the evidence claim unless reasonable minds could not reach the conclusion that the trier of fact did. *See State v. Tibbetts,* 92 Ohio St.3d 146, 162, 749 N.E.2d 226 (2001); *State v. Treesh,* 90 Ohio St.3d 460, 484, 739 N.E.2d 749

(2001). Here, after our review of the record, we believe the State presented evidence that, if believed, could support a finding of guilty of burglary, as a complicitor, beyond a reasonable doubt.

## B.  LEGAL ANALYSIS

### a.  Count Three, Burglary

{¶57} Stevens was convicted of Burglary, R.C. 2911.12(A)(3), which provides in pertinent part:  "No person, by force, stealth, or deception, shall do any of the following:  Trespass in an occupied structure * * * with purpose to commit in the structure * * * any criminal offense."  Importantly, Stevens was convicted as complicit to the criminal activities at Davis's house which took place on separate occasions during the late hours of December 26, 2013 to the early morning hours of December 27, 2013.  This count was alleged to have occurred during the first occasion when the principal offenders, Stevens' crew, went to Davis's home and were disrupted.  Stevens argues that the evidence is not sufficient to establish that the crew trespassed into Davis's home on the first occasion of the evening.

{¶58} We disagree.  David Lowery testified that when he and his wife arrived, they first checked the doors and the outer buildings.  While he testified the doors were locked, he added, "Nothing much seemed out of place."  The Lowerys went to check on Sherry's father's home.  When they

returned, David testified that, "some things had been moved around, found some windows unlocked." During the State's case, the prosecutor questioned Jeremy Myers, "What do you learn when they come to your house?" Myers replied, "I learned that they went over there and that they broke in there and then they got ran off."

{¶59} In reviewing sufficiency of the evidence claims, courts must remain mindful that the elements of an offense may be established by direct evidence, circumstantial evidence, or both. *See State v. Durr*, 58 Ohio St.3d 86, 568 N.E.2d 674 (1991); *State v. King,* 4th Dist. Meigs No. 21CA2, 2022-Ohio-4616, at ¶ 24. Circumstantial and direct evidence are of equal evidentiary value. *See State v. Jenks*, 61 Ohio St.3d at 272 ("Circumstantial evidence and direct evidence inherently possess the same probative value [and] in some instances certain facts can only be established by circumstantial evidence."). When reviewing the value of circumstantial evidence, "the weight accorded an inference is fact-dependent and can be disregarded as speculative only if reasonable minds can come to the conclusion that the inference is not supported by the evidence." *Wesley v. The McAlpin Co*. (May 25, 1994) Hamilton App. No. C-930286.

{¶60} From the above testimony, the jury likely inferred that a few

things outside the home were out of place. Moreover, the jury found credible David Lowery's testimony that things inside the house were moved around and inferred that an entry was made into the Davis home. This is corroborated by Myers' testimony that the crew told him they broke in. The trial court instructed the jury that they were the sole judges of the credibility of the witnesses and further instructed they were free to believe all or any part of the testimony of any witness. The jury also apparently found Myers' testimony credible, as well as David Lowery, on this point.

{¶61} Based on the foregoing, we believe the evidence supports a finding beyond a reasonable doubt that the crew entered Davis's home on the first occasion of their presence on his property. Stevens was found to be complicit as he supported and encouraged their criminal conduct. Thus, we find no merit to this argument.

b. Count Three, Firearm Specification

{¶62} Stevens was also convicted of a firearm specification in Count Three, R.C. 2941.141(A), which "specifies that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense." Stevens contends there is not sufficient evidence to convict him of this specification because there is no evidence that Shane Adkins, Brandon Allen, or Kenn Wells had a firearm on or about their

person while committing burglary. The State of Ohio points to the evidence

of the crew's entry into the home and exerted control over the premises and

the gun safe until they were thwarted. The State also directs us to *State v.*

*Powell,* 59 Ohio St.3d 62, 571 N.E.2d 125 (1991), wherein the Supreme

Court held that:

> (1) defendants could be given additional three-year term of incarceration for possession of firearm during commission of aggravated burglary where firearm was acquired by theft during burglary; (2) firearm did not have to be used during the offense so long as it was in defendant's possession or control at some point during commission of crime; and (3) firearm specification could be imposed on the basis of possession of firearm by any accomplice involved in offense.

{¶63} Citing the legislative intent of R.C. 2929.71, the *Powell*

Court observed:

> [T]he General Assembly sought to deter and punish both the use and possession of firearms by people who commit crimes. The public policy behind this enactment is apparent: a criminal with a gun is both more dangerous and harder to apprehend than one without a gun. Further, it is obvious that a gun stolen during a burglary can be as dangerous as one which the burglar has at the start of the crime.

{¶64} The Second District Court of Appeals applied this reasoning

more recently in *State v. Davis,* 2d Dist. Clark No. 2019CA67, 2020-Ohio-

3109, at ¶ 38, in a case involving the same statute as with Stevens is charged.[5]

{¶65} Furthermore, "the Ohio Supreme Court has held that [an accused] is subject to a sentencing enhancement on a firearm specification regardless of whether he was the principal or an unarmed accomplice." S*tate v. King,* 12th Dist. Butler No. CA2021-09-116, 2022-Ohio-3178, at ¶ 24; *State v. Humphries*, 8th Dist. Cuyahoga No. 99924, 2014-Ohio-1230, ¶ 18, citing *State v. Chapman,* 21 Ohio St.3d 41, 42, 487 N.E.2d 566 (1986), (upholding unarmed accomplice's conviction for aggravated robbery with a firearm specification).  "In such a case, the actions of the principal are imputed to the accomplice, and the accomplice 'may be found to have committed every element of the offense committed by the principal, including possession of the weapon.' "  *State v. Frost,* 164 Ohio App.3d 61, 2005-Ohio-5510, ¶ 20, 841 N.E.2d 336 (2d Dist.), quoting *State v. Letts,* 2d Dist. Montgomery No. 15681, 2001 WL 699537, *3, 2001 Ohio App. LEXIS 2749, *9 (June 22, 2001).  *See also State v. Johnson.,* 4th Dist. Scioto No. 95CA2327, 1996 WL 243394, (May 9, 1996), at ¶ Fn 3.

---

[5]*See also State v. Williams,* 4th Dist. Highland No. 97CA298, 1998 WL 290240, at *2,  (It was not necessary for defendant to have a deadly weapon in his possession at the time he entered the victim's home so long as he obtained such a weapon while in the process of perpetrating the burglary).

{¶66} Stevens was convicted as complicit to burglary in Count Three. As an accomplice rather than as the principal offender, the State need not prove that Stevens actually possessed a firearm to satisfy R.C. 2941.141. Rather, constructive possession is sufficient. Robbie Davis testified he kept a loaded pistol in his sock drawer. He testified his safe contained over 40 various firearms: shotguns, high-powered rifles, pistols. The pistol was loaded and Davis testified that several of the firearms in his safe worked. When breaking into Davis's house, the crew that Stevens aided and abetted had control of Davis's premises, the bedroom where the pistol was located, and the safe. These firearms were under the crew's control during the commission of the burglary.[6]

{¶67} We find no merit to Stevens' argument that there was not sufficient evidence to support his conviction on the Specification to Count Three.

c. Count Two, Burglary

{¶68} Stevens was also convicted of R.C. 2911.12(A)(2), which

---

[6] *See State v. Moore,* 7th Dist. Mahoning No. 12 MA 8, 990 N.E.2d 625, 2013-Ohio-1435, ¶ 65 ("a firearm specification was and still is an enhancement to a predicate offense, and the complicity statute provides that the person complicit in the offense can be prosecuted 'and punished' as if he were the principal").

provides that "[n]o person, by force, stealth, or deception, shall * * * [t]respass in an occupied structure * * * that is a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense." Stevens contends that there was not sufficient evidence to establish the element that "any person other than an accomplice of the offender is present or likely to be present." Stevens argues the third burglary occurred in the early morning hours while the Davis family was still in Florida and after the neighbors and law enforcement had left.

{¶69} The State of Ohio points to the evidence in the record that, to Stevens' knowledge, others planned on staying after the first disruption at the property. David Lowery and Sherry Lowery both testified that Tony Davis, Frank Davis and David had considered staying at Robbie Davis's house to protect it after the first burglary. Both Lowerys testified Stevens was gone, however, before the group made the ultimate decision not to stay. Again, the credibility of the witnesses at trial is always the province of the trier of fact, in this case, the jury.

{¶70} While there is not a great deal of testimony on this point, there

is enough that, if believed, and construing the evidence in a light most favorable to the State, a rational trier of fact could have found that Stevens' burglary crew trespassed into the Davis home when another person was likely to be present. Moreover, Stevens encouraged and supported them in doing so, knowing the residence was likely to be occupied by persons looking out for Robbie Davis's interests.

{¶71} We find no merit to Stevens' argument that the evidence was not sufficient to establish that he trespassed into an occupied structure when another person was present or likely to be present, when he was convicted as a complicitor, as alleged in Count Two.

{¶72} We realize that Stevens' convictions rest largely on circumstantial evidence and the jury's evaluation of Jeremy Myers' credibility. However, " 'in deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact.' " *State v. King,* 4th Dist. Meigs No. 21CA2, 2022-Ohio-4616, at ¶ 23, quoting *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, 968 N.E.2d 27, ¶ 25 (1st Dist.); *State v. Bennett,* 2019-Ohio-4937, 149 N.E.3d 1045, ¶ 46 (3d

Dist.).  The jury obviously found Jeremy Myers, despite his own criminal background, a convincing witness.

{¶73} Based on the foregoing, we find no merit to Stevens' first assignment of error.  It is hereby overruled.

ASSIGNMENT OF ERROR TWO - CONFRONTATION CLAUSE

{¶74} Under the second assignment of error, Stevens asserts that his constitutional right to confront evidence against him was violated when the trial court allowed a Call Detail Record (CDR), State's Exhibit 18, to be introduced into evidence during the testimony of Deputy Brock Bowman. Stevens contends that the record was not a business record but instead, constituted a testimonial record prepared for the purpose of litigation. State's Exhibit 18 was admitted into evidence without objection.

## A. STANDARD OF REVIEW

{¶75} The admission of evidence is within the sound discretion of the trial court.  *State v. Jackson*, 4th Dist. Washington No. 12CA16, 2013-Ohio-2628, at ¶ 16; *State v. Dixon,* 4th Dist. Scioto No. 09CA3312, 2010-Ohio-5032, at ¶ 33, citing *State v. Sage,* 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), at paragraph two of the syllabus.  Evid. R. 103(A) follows the longstanding rule that the failure to make a specific objection to the admission of evidence waives the objection and it cannot thereafter form the

basis of a claim in an appellate court. *State v. Schroeder,* 2019-Ohio-4136, 147 N.E.3d 1, at ¶ 39 (4th Dist.); *Kent v. State*, 42 Ohio St. 426, 430–431, 1884 WL 256. Crim.R. 52(B), however, provides a mechanism by which defendants may obtain review of "plain errors" that affected "substantial rights" even where they failed to object. Generally, appellate courts take notice of plain error under Crim.R. 52(B) with the utmost caution, only under exceptional circumstances and only to prevent a manifest miscarriage of justice. *State v. Gardner,* 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, ¶ 78; *State v. Patterson*, 4th Dist. Washington No. 05CA16, 2006-Ohio-1902, at ¶ 13; *State v. McCluskey*, 4th Dist. Ross No. 17CA3604, 2018-Ohio-4859, at ¶ 11. Plain error should be noticed if the error seriously affects the fairness, integrity or public reputation of judicial proceedings. *State v. Bundy,* 2012-Ohio-3934, 974 N.E.2d 139, at ¶ 66 (4th Dist.).

{¶76} In contrast to rulings under the Ohio Rules of Evidence, trial court rulings that implicate the Confrontation Clause are reviewed de novo. *State v. Lawson*, 2020-Ohio-3008, 154 N.E.3d 658, at ¶ 22 (10th Dist.), citing *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 97, citing *State v. Hymore*, 9 Ohio St.2d 122, 128, 224 N.E.2d 126 (1967), and *United States v. Henderson,* 626 F.3d 326, 333 (6th Cir. 2010). But even in cases where the defendant has established a violation of rights

under the Confrontation Clause, the Supreme Court of Ohio has consistently applied a harmless-error analysis to determine whether the issue prejudiced the defendant. *See McKelton* at ¶ 192, quoting *Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726 (1969), citing *Schneble v. Florida,* 405 U.S. 427, 432, 92 S.Ct. 1056 (1972) (where " 'there is [no] reasonable possibility that the improperly admitted evidence contributed to the conviction,' * * * alleged confrontation error was harmless beyond a reasonable doubt").

## B. LEGAL ANALYSIS

{¶77} "The Confrontation Clause to the Sixth Amendment of the United States Constitution, made applicable to the states by the Fourteenth Amendment, provides that ' "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *." ' " *State v. Thomas,* 3d Dist. Marion No. 9-19-73, 2020-Ohio-5379, ¶ 17, quoting *Crawford v. Washington,* 541 U.S. 36, 42, 124 S.Ct. 1354 (2004), quoting the Confrontation Clause. The similar provisions of Article I, Section 10 of the Ohio Constitution "provide[ ] no greater right of confrontation than the Sixth Amendment * * *." *State v. Self,* 56 Ohio St.3d 73, 79, 564 N.E.2d 446 (1990).

{¶78} "Only testimonial hearsay implicates the Confrontation

Clause." *State v. McKelton,* 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 185, 70

N.E.3d 508. " '[T]estimonial statements are those made for "a primary

purpose of creating an out-of-court substitute for trial testimony." ' " *Id.*

quoting *State v. Maxwell,* 139 Ohio St.3d 12, 2014-Ohio-1019, ¶ 40, 9

N.E.3d 930, quoting *Michigan v. Bryant,* 562 U.S. 344, 358, 131 S.Ct. 1143

(2011). Statements qualify as testimonial if they have a "primary purpose"

of "establish[ing] or prov[ing] past events potentially relevant to later

criminal prosecution." *Davis v. Washington,* 547 U.S. 813, 822, 126 S.Ct.

2266 (2006). The Confrontation Clause prohibits admission of testimonial

hearsay statements made by a witness who does not appear at trial "unless

the witness is unavailable and the defendant has had a prior opportunity to

cross-examine the witness." *Maxwell* at ¶ 34, citing *Crawford* at 53-54, 124

S.Ct. 1354.

{¶79} Business records are typically considered to be nontestimonial

because " 'they are prepared in the ordinary course of regularly conducted

business and are "by their nature" not prepared for litigation.' " *State v.*

*Craig,* 110 Ohio St.3d 306, 2006-Ohio-4571, ¶ 82, 853 N.E.2d 621, quoting

*People v. Durio,* 7 Misc.3d 729, 734, 794 N.Y.S.2d 863 (2005). Business

records are "generally admissible absent confrontation not because they

qualify under an exception to the hearsay rules, but because—having been

created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." *Melendez-Diaz v. Massachusetts,* 557 U.S. 305, 324, 129 S.Ct. 2527 (2009). Cell phone records usually qualify as business records because "[e]ven when cell phone companies, in response to a subpoena, prepare types of records that are not normally prepared for their customers, those records still contain information that cell phone companies keep in the ordinary course of their business." *State v. Hood*, 135 Ohio St.3d 137, 2012-Ohio-6208, ¶ 36, 984 N.E.2d 1057. Accordingly, the Confrontation Clause does not normally affect the admissibility of cell phone records. *Id.* at ¶ 39.

{¶80} Nevertheless, unless it is established that a cell phone record is in fact a business record, the Confrontation Clause can operate to bar admission of the record. Evid.R. 803(6) governs the admissibility of business records. "To qualify for admission under Rule 803(6), a business record must manifest four essential elements: (i) the record must be one regularly recorded in a regularly conducted activity; (ii) it must have been entered by a person with knowledge of the act, event or condition; (iii) it must have been recorded at or near the time of the transaction; and (iv) a foundation must be laid by the 'custodian' of the record or by some 'other qualified witness.' " *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2,

¶ 171, 880 N.E.2d 31, quoting Weissenberger, Ohio Evidence Treatise 600, Section 803.73 (2007). Evid.R. 803(6)'s foundational requirement is especially critical in this context. Without a certification or affidavit authenticating cell phone records as business records or testimony from a "custodian or other qualified witness" identifying the cell phone records as authentic business records, it cannot be determined whether the cell phone records are nontestimonial. Under such circumstances, admission of the cell phone record is constitutional error. *Id*. at ¶ 42.

{¶81} In this case, Deputy Bowman testified that phone records of Dean Stevens, Brandon Allen, Jeremy Myers, and Timothy Stein were subpoenaed for the investigation into the robberies which occurred at Rob Davis's home. Deputy Bowman identified State's Exhibit 18, the CDR. The data obtained and listed on the CDR was from a cell phone registered to Dean Stevens. He was listed as the target name. The CDR showed a begin date of December 26, 2013 at 10:07 [7] until December 27, 2013 at 8:41 p.m. Deputy Bowman testified the CDR represented all the ingoing and outgoing phone calls and text messages occurring during the limited timeframe on December 26-27. Deputy Bowman did not create the CDR.

{¶82} Bowman further identified State's Exhibit 13, a certifying

---

[7]There is no testimony as to whether this was a.m. or p.m.

letter from the Ohio Department of Natural Resources listing Brandon

Allen's personal phone number on his wildlife license as of May 2011.

Based on the information contained in State's Exhibits 13 and 18, Bowman

testified that during the pertinent time period, Stevens called Brandon Allen

three times and Allen called Stevens one time.

{¶83} It was incumbent on the State to authenticate the CDR as a

business record under Evid.R. 803(6).  Although Bowman testified he

obtained the CDR information by subpoenaing the cell phone records of

Stevens and Brandon Allen, he was not a custodian of the cell phone records

or an "other qualified witness" as that term is used in Evid.R. 803(6).  *See*

*State v. Sutton* 3d Dist. Seneca No. 13-21-11, 2022-Ohio-2452, at ¶ 46.

Furthermore, the trial record contains no certification or affidavit

authenticating the CDR as a business record, and no representatives from

Stevens' or Allen's cellular service providers were subpoenaed to testify at

trial.  Thus, the State failed to authenticate the cell phone records as business

records, making it impossible to determine whether the records are

nontestimonial.  Because it is not possible to determine whether the cell

phone records are nontestimonial, the trial court erred by admitting the

evidence derived from those records.

{¶84} At trial, Stevens did not object to Deputy Bowman's

testimony or to the admission of State's Exhibit 18, the CDR, for lack of

proper authentication. As a result, our review is limited to whether the trial

court committed plain error by admitting the CDR into evidence. For plain

error to apply, the trial court must have deviated from a legal rule (the "error

prong"), the error must have been plain, i.e., an obvious defect in the

proceeding (the "plainness prong"), and the error must have affected the

defendant's "substantial rights" (the "substantial-rights prong"). *State v.

Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).

{¶85} The trial court's admission of Deputy Bowman's testimony

and State's Exhibits 13 and 18 clearly satisfies the first two prongs of the

plain-error test—the trial court committed constitutional error by admitting

the unauthenticated cell phone records and the error is "obvious on the

record, palpable, and fundamental such that it should have been apparent to

the trial court without objection." *State v. Gullick,* 10th Dist. Franklin No.

13AP-26, 2013-Ohio-3342, ¶ 3.

{¶86} The relevant question thus becomes whether the trial court's

error affected Stevens' substantial rights. The Supreme Court of Ohio has

interpreted the substantial-rights prong of the plain-error test "to mean that

the trial court's error must have affected the outcome of the trial." *Barnes* at

27, 759 N.E.2d 1240. For decades, the court consistently described this

standard in terms of outcome determination—i.e., that "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus; *see State v. Quarterman,* 140 Ohio St.3d 464, 2014-Ohio-4034, ¶ 16, 19 N.E.3d 900; *State v. Hill,* 92 Ohio St.3d 191, 203, 749 N.E.2d 274 (2001); *State v. Moreland*, 50 Ohio St.3d 58, 62, 552 N.E.2d 894 (1990). But in 2015, in *State v. Rogers,* 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, the court appeared to embrace a more relaxed standard. In *Rogers,* the court explained that in order to show that the trial court's error affected the outcome of the trial, the accused is "required to demonstrate a reasonable probability that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims." (Emphasis sic.) *Id*. at ¶ 22. Two years after *Rogers*, in *State v. Thomas,* 152 Ohio St.3d 15, 2017-Ohio-8011, 92 N.E.3d 821, a plurality of the court indicated that *Rogers* had "clarified" the substantial-rights prong of the plain-error test. *Id*. at ¶ 33.

{¶87} Recently, in *State v. West*, 168 Ohio St.3d 605, 2022-Ohio-1556, 200 N.E.3d 1048, a three-justice plurality of the court held to the position that *Rogers* " 'rejected the notion that there is any category of forfeited error that is not subject to the plain error rule's requirement of

prejudicial effect on the outcome.' " *Id*. at ¶ 2, quoting *Rogers* at ¶ 24. In doing so, the plurality used both outcome-determinative and reasonable-probability standards in describing the substantial-rights prong, at times using language related to both standards in the same sentence. *Id*. at ¶ 22, 29, 35-36. For instance, the three-justice plurality noted that the defendant bore "the burden to establish a reasonable probability that but for the judge's actions, he would not have been found guilty of the charged offenses," and it held that the defendant "failed to establish the prejudice prong of the plain-error rule" because he was "unable to show any reasonable probability that the outcome of his trial would have been otherwise." *Id*. at ¶ 35 -36. This articulation of the standard, i.e., that the defendant must show a reasonable probability that the error was outcome-determinative, mirrors the one the court applies when reviewing assertions of prejudice in ineffective-assistance-of-counsel claims. *E.g., State v. Sowell,* 148 Ohio St.3d 554, 2016-Ohio-8025, ¶ 138, 71 N.E.3d 1034 ("To establish ineffective assistance of counsel, an appellant must show * * * prejudice, i.e., a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have been different."). And although this expression of the standard did not garner a majority in *West,* it was essentially approved by a unanimous court the very next day in *State v. McAlpin,* Slip Opinion No.

2019-0926, 2022-Ohio-1567, 2022 WL 1493680, *Id*. at ¶ 90 ("McAlpin could not establish plain error, because he cannot show a reasonable probability that but for standby counsel's actions, the jury would have acquitted him.").

{¶88} Thus, when assessing the substantial-rights prong of the plain-error test, courts ought to apply the standard endorsed by the Supreme Court of Ohio in *Rogers,* as implemented by the three-justice plurality in *West* and the unanimous court in *McAlpin.*  That is, to demonstrate that the trial court's error affected a substantial right, the defendant must establish that there is a reasonable probability that, but for the trial court's error, the outcome of the proceeding would have been otherwise.  This in turn requires the defendant to show " 'that the probability of a different result is "sufficient to undermine confidence in the outcome" of the proceeding.' "  *State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, ¶ 130, 114 N.E.3d 1138, quoting *United States v. Dominguez Benitez,* 542 U.S. 74, 83, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004), quoting *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052 (1984).

{¶89} In applying the above standard in Stevens' case, although the cell phone records were not authenticated as business records pursuant to Evid.R. 803(6), the trial court did not commit plain error by admitting the

evidence derived from those records. While we observe that the State's case was somewhat bolstered due to Deputy Bowman's testimony and State's Exhibits 13 and 18, even with this evidence removed from the equation we are not persuaded that the outcome of Stevens' trial would have been different. While the State's case against Stevens is certainly stronger with the CDR than it is without it, the probability that a trial untainted by the trial court's error would have turned out differently is not so great as to undermine our confidence in the outcome of Stevens' trial.

{¶90} In our view, a trier of fact aware of the testimony elicited at trial from Jeremy Myers, Robbie Davis, Sherry Lowery, David Lowery, and through the recorded statement between Myers and Stevens, would not be likely to find that the State failed to prove Stevens' complicity in the burglaries. Myers testified as to the conversation he overheard in Stevens' garage, wherein Stevens knew that Davis was going to be away from his home. Robbie Davis testified that he was talking to Stevens while he installed his surveillance camera a few days before he left. It can be inferred that Stevens knew to be on the lookout for the surveillance camera. According to Davis, Stevens also knew Davis had a safe because they purchased them at the same time.

{¶91} Myers also testified that Stevens planned the burglaries as a

way of paying back Brandon Allen for money owed. The plan was for Allen, Myers and Kenny Wells to break into Davis's home and steal his safe. Brandon Allen would get the money in the safe and Stevens was to get the firearms. Myers testified the next day that Stevens told him that "their dumb asses went in there and got caught so he fixed it." According to Myers, Stevens broke the SD card from the surveillance camera so there wouldn't be anything to identify the crew and left a Ford truck key on an outside water spout so the crew could use a truck to move the safe.

{¶92} Both Sherry Lowery and David Lowery testified about the surveillance camera from Davis's bedroom. After attempts to play the card were unsuccessful, Tony Davis then laid the SD card on the kitchen table. Stevens also tried to play the SD card on his phone. The next time Sherry Lowery saw the SD card on the kitchen table, it was broken. Stevens was also present when she placed Davis's keys out of sight, on a Lazy Susan. The testimony about the broken SD card tracks Myers' testimony that Stevens broke it. The fact that Stevens was present when Sherry Lowery placed the keys out of sight demonstrates he knew where to find the key he later placed on the water spout. This fact was also corroborated by Myers' testimony.

{¶93} Rob Davis testified he kept a pistol in his sock drawer in his

bedroom, where the surveillance camera was located. Sherry Lowery testified that Stevens confirmed the pistol was in the drawer, from which we may infer Stevens was in the bedroom where the camera was located. When Sherry left the room, the surveillance camera was not pointing upward. When she returned the next day, the camera was pointed upward.

{¶94} Myers testified about the secretly recorded statement in which Stevens and he discuss the burglaries. Stevens never denies participation in the crimes. These details are set forth fully below in Assignment of Error Four. The jury also heard the recorded statement.

{¶95} We find that Stevens has failed to demonstrate that there is a reasonable probability that, but for the trial court's erroneous admission of the CDR, the outcome of his trial would have been different. Consequently, Stevens failed to establish the substantial-rights prong of the plain-error test, and we conclude that the trial court did not commit plain error by allowing Detective Bowman's testimony about the CDR or by admitting State's Exhibits 13 and 18. Based on the foregoing, we find no merit to Stevens' second assignment of error and it is hereby overruled.

ASSIGNMENT OF ERROR THREE - INEFFECTIVE

ASSISTANCE OF COUNSEL

{¶96} Stevens argues that his trial attorney's performance fell below

the objective standard of reasonableness. In this case, Stevens was convicted of planning and participating in burglaries which occurred in December 2013, yet he was not indicted until December 2019. By this time, Stevens' health had declined. Stevens' trial counsel did not move the court to dismiss the indictment on the basis of alleged unjustifiable and prejudicial preindictment delay. Stevens contends that by the time of trial, due to his physical and mental decline, he was unable to assist in his own defense. Thus, Stevens urges us to conclude that his counsel's omission demonstrates deficient performance and that he was prejudiced by the alleged deficient performance.

## A. STANDARD OF REVIEW

{¶97} "To prevail on an ineffective assistance claim, a defendant must show: '(1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different.' " *State v. Dixon,* 4th Dist. Hocking No. 21CA10, 2022-Ohio-4454, at ¶ 46, quoting *State v. Short,* 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 113, citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052 (1984). Failure to satisfy either part of the test is fatal to the claim. *See Strickland* at 697. The

defendant "has the burden of proof because in Ohio, a properly licensed attorney is presumed competent." *State v. Gondor,* 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 62. We "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158 (1955); *State v. Moore,* 4th Dist. Pickaway No. 20CA10, 2021-Ohio-4414, ¶ 12.

## B. LEGAL ANALYSIS

{¶98} " 'Decisions to grant or deny a motion to dismiss on grounds of preindictment delay are reviewed for an abuse of discretion.' " *State v. Thacker,* 4th Dist. Lawrence No. 19CA18, 2021-Ohio-2726, at ¶ 35, quoting *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 33. "Appellate review of a trial court's decision on a motion to dismiss for a speedy trial violation involves a mixed question of law and fact. Generally, an appellate court will defer to a trial court's factual findings if competent and credible evidence supports those findings. However, an appellate court will review de novo a trial court's application of the law to those facts." (Citations omitted.) *State v. Phillips,* 2018-Ohio-

1794, 111 N.E.3d 351, ¶ 9 (4th Dist.).  Had Stevens' counsel filed a motion to dismiss based upon preindictment delay, the trial court would have reviewed it under the above standards.

{¶99} "A criminal defendant has a right to a speedy trial under the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution.  'The Due Process Clause of the Fifth Amendment provides limited protection against preindictment delay.' " *Thacker, supra,* at ¶ 37*,* quoting *State v. Adams,* 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 97, citing *United States v. Lovasco*, 431 U.S. 783, 789–790, 97 S.Ct. 2044 (1977).  These rights afford no protection to those who have not yet been accused unless preindictment delay has caused actual prejudice to the defendant.  *Thacker, supra.*

{¶100} The Supreme Court of Ohio recently revisited the framework for analyzing a due-process claim based on preindictment delay in *State v. Bourn,* Ohio Slip Opinion No. 2022-Ohio-4321, 2022 WL 174194-5. " '[P]reindictment delay violates due process only when it is unjustifiable and causes actual prejudice.' " *Bourn, supra*, at ¶ 11, quoting *State v. Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, at ¶ 12.  This court has "firmly established a burden-shifting framework for analyzing a due-process claim based on preindictment delay." *Id.* at ¶ 13.  Pursuant to that

framework, a defendant first bears the burden of presenting evidence that the preindictment delay caused actual prejudice. *Id*., citing *State v. Whiting,* 84 Ohio St.3d 215, 217, 702 N.E.2d 1199 (1998), and *State v. Adams,* 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 99. After the defendant has provided evidence of actual prejudice, the burden shifts to the state to produce evidence of a justifiable reason for the delay. *Id.,* citing *Whiting* and *Adams.*

{¶101} *Jones* explained that the actual prejudice determination is inherently dependent on the particular facts of each case: "A determination of actual prejudice involves ' "a delicate judgment" ' and a case-by-case consideration of the particular circumstances." *Id*. at ¶ 20, quoting *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, ¶ 52, quoting *United States v. Marion,* 404 U.S. 307, 325, 92 S.Ct. 455 (1971). *See also Bourn, supra*, at ¶ 12. Near the conclusion of its analysis in *Jones,* the Court succinctly stated its key holding: " 'Actual prejudice exists when missing evidence or unavailable testimony, identified by the defendant and relevant to the defense, would minimize or eliminate the impact of the state's evidence and bolster the defense.' " *Bourne*, at ¶ 14*,* quoting *Jones,* 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, at ¶ 28, citing *State v.*

*Luck,* 15 Ohio St.3d 150, 157-158, 472 N.E.2d 1097 (1984).  The *Bourn*

court observed:

> The use of the word "would" in the *Jones* decision is significant. It is not enough for a defendant to show that the missing evidence or unavailable testimony "could" or "may" help the defendant. Instead, the defendant must show that the evidence or testimony would help the defendant.

*Id*. at ¶17.[8]

{¶102} Having discussed the framework detailed in *Bourn* and *Jones*

and affirmed in those cases as the proper method to apply in analyzing this

case, we now proceed to determine whether Stevens presented evidence of

actual prejudice.

> 1. <u>Did Stevens demonstrate actual prejudice due to the fact that in the intervening years several fact witnesses died?</u>

{¶103} Stevens and the victim of the burglaries, Robbie Davis, are

cousins.  Many of the persons who showed up to investigate or otherwise

assist at Davis's house at the time of the burglaries in 2013 were family

---

[8]Recognizing that it may be a high standard for defendants, the Supreme Court of Ohio observed: "the standard is commensurate with the defendant's burden in these cases." *Bourn, supra*, at ¶18. " '[T]he burden upon a defendant seeking to prove that preindictment delay violated due process is nearly "insurmountable." ' " *Adams, supra,* 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, at ¶ 100*, quoting United States v. Montgomery,* 491 Fed.Appx. 683, 691 (6th Cir. 2017), quoting *United States v. Rogers,* 118 F.3d 466, 477 (6th Cir.1997), fn. 10. *See Bourn, supra*.  "[W]hile it may be difficult to prove a pretrial claim for preindictment delay, a defendant is not barred from seeking review of a preindictment-delay claim at the close of trial, when the impact and significance of missing evidence or unavailable testimony may be clearer." *Bourn, supra.*

members related to both Stevens and Davis. Stevens asserts that during the intervening years between the burglaries and his indictment for the crimes, the "only non-relative witnesses died." Stevens contends that these non-relative witnesses were the only truly neutral parties who could have testified about key facts. The State responds that Stevens has failed to explain what exculpatory evidence that these witnesses would have offered and therefore fails to establish actual prejudice. We agree. As discussed above, "Actual prejudice exists when * * * unavailable testimony identified by the defendant and relevant to the defense would minimize or eliminate the impact of the state's evidence and bolster the defense." *Jones* at ¶ 28; *Bourn,* at ¶ 14.

{¶104} We first observe that Stevens vaguely references these non-relative neighbor witnesses but does not identify them. In the reply brief, Stevens argues that these persons witnessed the initial activity at Davis's house before calling his family to the scene. He argues these witnesses could have testified about the truck in the driveway; whether the Davis's house was disturbed; who unlocked the deadbolt to Davis's house; whether Stevens was accompanied when he checked the fields and what was his location when Sherry returned to Davis's house.

{¶105} Our review of the pleadings and trial transcript indicates

several persons, in addition to those that testified at trial, as potential non-relative neighbor witnesses:  Eric Smith, Deanna Tatman, Rick Reid, Debbie Woodward, Larry Wray, Derick Shirey, Christopher Crockett, Virgil Woods, Owen Eveland, and Threse Eveland.  Stevens explains neither which of these potential witnesses are the non-relative neighbors nor, importantly, the substance of their allegedly exculpatory testimony.  As noted above, *Jones* and *Bourn* require a showing that such testimony would minimize or eliminate the impact of the state's evidence and bolster the defense. Stevens indicates only that these witnesses "could" have testified about his whereabouts during the pertinent time frames, not what the witnesses "would" have testified.

{¶106} Stevens' argument constitutes pure speculation.  We do not know who these witnesses are.  We do not know the precise exculpatory information that these unspecified witnesses supposedly possessed, and we do not know how the alleged exculpatory information would have minimized or eliminated the impact of the state's evidence and bolstered Stevens' defense.  Based on the foregoing, Stevens cannot show actual prejudice.

> 2. <u>Did Stevens demonstrate actual prejudice due to the fact that Ed Downs was unavailable by the time of his trial?</u>

{¶107} Stevens asserts that Detective Ed Downs, formerly of the Hocking County Sheriff's Office, spearheaded the investigation of the criminal activities which occurred at Robbie Davis's home in December 2013. Stevens informs that by the time of his 2021 trial, Downs had resigned from his position with Hocking County after being under investigation.[9] Stevens asserts that Downs' unavailability as a witness at trial prejudiced the defense because it was necessary to cross-examine Downs as to his use of coercion and undue influence upon Jeremy Myers and Timothy Stein. Myers wore a wire to record a conversation with Stevens. Stein drove Myers to meet Stevens and Stein's voice is heard briefly on the recording. Myers entered a plea agreement with the State of Ohio, terms of which included his agreement to testify at any trial of Stevens or two other persons.[10]

{¶108} The Logan County Common Pleas Court docket reveals that the State served a subpoena on Ed Downs at 1296 Highland Park Road, Logan, Ohio, on June 3, 2021. Thus, it appears Downs was available although the State chose not to call him. As the State points out, if Stevens

[9]Throughout trial the defense attempted to cast aspersions on Downs' character by veiled references about his resignation and an unspecified investigation of him.
[10]Timothy Stein was in jail with Myers on a probation holder when Detective Downs approached Myers for questioning. Apparently Stein also got out at the same time as Myers although anything he knew about Stevens or the robberies did not enter into the evidence at trial.

wished to have Ed Downs attend trial to provide crucial cross-examination testimony, Stevens could have also subpoenaed Downs for attendance at trial.

{¶109} Moreover, had defense counsel tracked down Ed Downs, the actual substance of his cross-examination testimony is unknown. Stevens has not shown how Ed Downs' potential cross-examination testimony would have minimized or eliminated the impact of the State's evidence and bolstered Stevens' defense. That upon cross-examination, Downs would have admitted any coercion and undue influence upon Jeremy Myers and Timothy Stein is only speculation. As such, we cannot say that Stevens has shown actual prejudice by his counsel's failure to procure testimony from Ed Downs at the trial.

     3. <u>Did Stevens demonstrate actual prejudice due to his serious health conditions and decline which rendered him unable to assist in his own defense at trial?</u>

{¶110} Stevens asserts that he had a brain injury and stroke in 2015, allegedly affecting his memory, communication, and presentation. In the defense's opening, Stevens' attorney argued that due to Stevens' health conditions, Stevens was unable to deny any involvement in the burglaries when secretly recorded by Jeremy Myers. Stevens contends that these health conditions impacted his ability to assist in his own defense and caused

actual prejudice.  After reviewing the record, we are unpersuaded by this argument.  Generally, courts have held that " 'a defendant's own general assertion that he does not remember details of an event that occurred [nearly 20 years ago] does not, in and of itself, constitute actual prejudice.' " *State v. Hunter*, 2017-Ohio-4180, 92 N.E.3d 137 (8th Dist. 2017), at ¶ 18, quoting *State v. Smith,* 8th Dist. Cuyahoga No. 100501, 2014-Ohio-3034, ¶ 26; *State v. Ricosky,* 5th Dist. Stark No. 2003CA00174, 2004-Ohio-2091, ¶ 15.

{¶111} Stevens directs us to the Fifth District's analysis in its finding of actual prejudice in *State v. Bost,* 5th Dist. Licking No. 2020CA00050, 2021-Ohio-2190.  Bost was indicted for murder in 2018 following the death of her boyfriend, Hughes, from three gunshot wounds inflicted by Bost.  Bost pled not guilty.  The trial court granted Bost's request for a psychological evaluation by an expert.  Bost claimed the shooting was in self-defense and that she suffered from Battered Woman's Syndrome.  The State of Ohio appealed the trial court's decision granting Bost's motion to dismiss due to preindictment delay.

{¶112} The trial court in *Bost* set forth the analysis to evaluate a claim of preindictment delay causing actual prejudice.  The trial court found Bost provided ample evidence of actual prejudice.  A domestic evaluation report prepared by a Dr. Fischer contained the doctor's opinion that Bost suffered

chronic and life-threatening abuse, leading to the conclusion that Bost suffered from Battered Woman Syndrome. Furthermore, due to the severity of strangulation and direct blows to her head, Bost may have experienced brain injury.

{¶113} In her motion to dismiss, Bost contended the preindictment delay prevented her from confirming her injuries with medical tests because her injuries healed during the passage of time from the offense in 2012 to the indictment in 2018. The State countered that the evidence of a brain injury was merely speculative because she was examined after the shooting and there was no medical evidence that she suffered from a head injury. Further, Bost could have sought additional medical testing in 2012 if she were concerned there was a possible brain injury. The trial court agreed that if medical testing had been done in 2012, the testing would have provided conclusive evidence whether Bost suffered a brain injury due to Hughes' physical assaults.

{¶114} That Bost had a physical injury was bolstered by the medical records from 2012 confirming that Bost suffered a deep contusion injury to her back. Bost would have less reason in this case to independently obtain medical testing because on May 18, 2012, the State closed the case without

charges, stating it would not review the case unless new evidence was discovered. The State stipulated that no new evidence had been discovered.

{¶115} Upon review, the appellate court found no abuse of discretion for the trial court to find that Bost suffered actual prejudice by the preindictment delay because evidence of her physical injuries was lost due to the passage of time. Citing the reasons set forth by the trial court, the appellate court affirmed the trial court's decision granting Bost's motion to dismiss.

{¶116} At Stevens' trial, the State played a recorded statement that Jeremy Myers obtained by wearing a wire. The recorded statement begins by identifying the date it was made as July 8, 2014. In the opening statement, defense counsel argued:

{¶117} After * * * he's had a stroke and been beaten to within an inch of his life with a ratchet and is in very serious physical and mental condition, [Stevens] doesn't deny the statements that this * * * Jeremy Myers gets him in a truck. All the talk is from Myers. Never once will we hear Dean say, oh, yeah, I did this and that * * *.

{¶118} Upon review, we find no merit to Stevens' assertion. The State points out, the recorded conversation with Jeremy Myers took place in July 2014, before Stevens' health allegedly declined. Stevens was

physically able to drive alone to meet Myers and got into the vehicle with

Myers without assistance. The recording demonstrates that the very first

question Stevens asked Myers when he got into the truck was whether or not

Myers was "wired," and Myers testified Stevens patted his stomach while

doing so. While Stevens did deny involvement in an unrelated criminal

matter, when confronted with a discussion about the burglaries at the Davis

home, three times, Stevens remained silent and did not deny involvement.

On this date, Stevens seems physically able and mentally capable of looking

out for his own best interests by asking about a wire and saying as little as

possible about the Davis burglaries.

{¶119} We also note that no motion for competency was filed.

Unlike Bost, Stevens provided no medical evidence documenting diagnosed

cognitive deficits or mental decline. Nothing in the record indicates

Stevens' health rendered him unable to assist in his defense. Thus, Stevens'

argument is again speculative.

{¶120} Based on the three arguments asserted within this assignment

of error, we do not find counsel's performance was deficient by failing to

file a motion to dismiss due to preindictment delay. In our view, such a

motion would likely have been a futile act. " 'The law does not require

counsel to take a futile act.' " *State v. Ludwick,* 4th Dist. Highland No.

21CA17, 2022-Ohio-2609, at ¶ 46, quoting *State v. Conant,* 4th Dist. Adams

No. 20CA1108, 2020-Ohio-4319, at ¶ 30.  And, the failure to perform a

futile act does not support a claim of ineffective assistance of counsel.  *State*

*v. Black,* 4th Dist. Ross No. 12CA3327, 2013-Ohio-2105, ¶ 37.

{¶121} Because we do not find counsel's performance was deficient,

we cannot find one of the necessary *Strickland* prongs and cannot find that

trial counsel rendered Stevens ineffective assistance.  Accordingly, this

assignment of error is without merit and is hereby overruled.

ASSIGNMENT OF ERROR FOUR - IMPROPER ADMISSION OF

EVIDENCE

{¶122} Stevens argues that the trial court erred by allowing evidence

referring to other alleged criminal acts or criminal tendencies attributed to

him which created an improper character inference.  Moreover, this evidence

was irrelevant and unfairly prejudicial.  This evidence came in at trial via the

recorded statement surreptitiously obtained by Jeremy Myers, who wore a

wire and engaged Stevens in conversation about criminal acts.

{¶123} Prior to trial, the State of Ohio filed a notice pursuant to

Evid.R. 404(B) of its intent to introduce evidence of "other acts" of the

defendant via the recorded statement. Stevens filed a Motion in Limine to

exclude the recorded statement. At trial, the court denied the motion.[11]

## A. STANDARD OF REVIEW

{¶124} Ordinarily, we review claims of improper and erroneous

admission or exclusion of evidence claims under the abuse-of-discretion

standard of review. And because a trial court's decision on a motion in

limine is a ruling to admit or exclude evidence, the standard of review on

appeal is whether the trial court committed an abuse of discretion that

amounted to prejudicial error. *State v. Fowler,* 2017-Ohio-438, 84 N.E.3d

269, ¶ 14 (10th Dist.); *Gordon v. Ohio State Univ.,* 10th Dist. Franklin No.

10AP-1058, 2011-Ohio-5057, at ¶ 82.

{¶125} However, courts use a three-step analysis to determine

whether evidence of other crimes, wrongs, or acts of an accused may be

admissible. *See State v. Ludwick*, 4th Dist. Highland No. 21CA17, 2022-

Ohio-2609, at ¶17; *State v. Williams,* 134 Ohio St.3d 521, 2012-Ohio-5695,

983 N.E.2d 1278, ¶ 19.

> The first step is to consider whether the other acts evidence
> is relevant to making any fact that is of consequence to the
> determination of the action more or less probable than it

---

[11]However, the trial court did exclude a portion of the recording which had to do with a person named "Chubb" and which is not relevant to this appeal.

would be without the evidence. Evid.R. 401. The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B). The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice. *See* Evid.R 403.

*Id.* at ¶ 20.

{¶126} Thus, the admissibility of other-acts evidence under Evid.R. 404(B) is a question of law that we review de novo. *See Ludwick*, at ¶18; *State v. Hartman,* 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 22 ("because '[d]etermining whether the evidence is offered for an impermissible purpose does not involve the exercise of discretion * * *, an appellate court should scrutinize the [trial court's] finding under a de novo standard' of review" (brackets and emphasis sic)). "Weighing the probative value of the evidence against its prejudicial effect is a highly fact-specific and context-driven analysis. Balancing the risks and benefits of the evidence necessarily involves an exercise of judgment; thus, the trial court's determination should be reviewed for an abuse of discretion." *Id.* at ¶ 30. Thus, we conduct a de novo review of the first two steps of the analysis (i.e., is the evidence relevant and is it presented for a legitimate purpose) and we conduct an abuse of discretion review of whether the probative value of it

outweighs the danger of unfair prejudice. *State v. Lotzer,* 3d Dist. Allen No. 1-20-30, 2021-Ohio-3701, ¶ 8 ("the first two steps (i.e., relevancy under Evid.R. 401 and Evid.R. 402 and the particular purpose the evidence is offered under Evid.R. 404(B)) are intertwined and pose legal questions, and thus, are reviewed under a de novo standard of review. * * * However, the third step (i.e., Evid.R. 403's balancing tests) 'constitutes a judgment call,' which we review under an abuse-of-discretion standard").

## B. LEGAL ANALYSIS

{¶127} Evid.R. 404(B) prohibits evidence of a defendant's "other crimes, wrongs, or acts" when "its only value is to show that the defendant has the character or propensity to commit a crime." *State v. Smith,* 162 Ohio St.3d 353, 2020-Ohio-4441, 165 N.E.3d 1123, ¶ 36. Defendant's other acts are admissible for another purpose, such as "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." In other words, " 'the evidence must prove something other than the defendant's disposition to commit certain acts.' " *Id.,* quoting *State v. Hartman,* 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 22. The *Smith* court observed:

> The threshold question is whether the evidence is relevant.
> * * * [T]he problem with other-acts evidence is rarely that
> it is irrelevant; often, it is too relevant. In the Evid.R.
> 404(B) context, the relevance examination asks whether

> the proffered evidence is relevant to the particular purpose
> for which it is offered, as well as whether it is relevant to
> an issue that is actually in dispute.

*Id*. at ¶ 37.

{¶128} *Smith* further noted that the court should begin by evaluating whether the evidence is relevant to a non-character-based issue material to the case. "If the evidence is not premised on improper character inferences and is probative of an issue in the case, the court must then consider whether the evidence's value 'is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.' " *Id*. at ¶ 37, quoting Evid. R. 403(A); *Hartman, supra*, at ¶29.

{¶129} Furthermore, as the Supreme Court of Ohio has held, " 'evidence of other crimes may be presented when "they are so blended or connected with the one on trial as that proof of one incidentally involves the other; or explains the circumstances thereof; or tends logically to prove any element of the crime charged." ' " *State v. Baird,* 8th Dist. Cuyahoga No. 111428, 2023-Ohio-303, at ¶ 61 (P.J. Sean Gallagher, concurring in judgment only); quoting *State v. Wilkinson,* 64 Ohio St.2d 308, 317, 415 N.E.2d 261 (1980), quoting *United States v. Turner*, 423 F.2d 481, 483-484 (7th Cir. 1970); *accord State v. Roe*, 41 Ohio St.3d 18, 23, 535 N.E.2d 1351

(1989); *see also State v. Evans*, 8th Dist. Cuyahoga No. 108648, 2020-Ohio-3968, ¶ 108.

{¶130} On appeal, Stevens asserts improper "other acts evidence" was admitted at his trial via the recorded statement made by Jeremy Myers. Stevens cites several violations: (1) a discussion about a stolen backhoe; (2) Myers' comments that Stevens hid his activities from his wife and father; (3) Myers' comments that he was uncomfortable getting into the vehicle with Stevens, implying Stevens' character for violence; (4) Stevens comment that he did not want to be seen in public with Myers; (5) Stevens comment that he let his burner phones run out; (6) Stevens had taken property to Chubb in an effort to make money. Stevens argues these "other acts" references bolstered Myers' testimony and created improper character references that were irrelevant and unfairly prejudicial.

{¶131} The recorded statement is difficult to hear in parts. The recording begins with a recitation of the date, July 8, 2014, at 12:19 p.m. and indicates that two confidential informants will be seeking Stevens in order to engage him in conversation about the burglaries at the Davis property in 2013. The two confidential informants attempt to speak to Stevens at his home. Eventually they make contact with Stevens and he instructs them to follow him to a different location because he "don't want anyone to see us

talking." Myers can also be heard saying to Timothy Stein that he doesn't want to get into the vehicle with Stevens.

{¶132} We have reviewed the recorded statement in its entirety and will set forth the relevant portions herein. When Myers gets into Stevens vehicle, the conversation is as follows:

| | |
|---|---|
| Stevens: | What's going on? |
| Myers: | I need to make some money. |
| Stevens: | You ain't wired are you? |
| Myers: | No. Shane has fucked us up. I got my motion for discovery back from Gallia County. Him and Brandon are on it. Talking about Rob Davis's house. Truck and trailer missing. You leaving the key for the truck. |
| Stevens: | Huh. |
| Myers: | I been leery to go around anybody. |

* * *

| | |
|---|---|
| Stevens: | I let everything run out. Let them all go. Don't know who to trust. |
| Myers: | I ain't saying shit about nothing. What's up? We gonna make some money. I got fucking heebie jeebies about moving that hoe. I got my discovery back. Robbie Davis house was broken into. You had it set up to be done. |

Stevens:                You think that's how he got out of jail?

Myers:                  I got a statement you wrote.

Stevens:                I never wrote one.  I never wrote anything.
                        I never knew anything about nothing.

Myers:                  Brandon went on in his statement about
                        Robbie Davis's house.  You left key for a
                        White Ford on the waterspout.  All that shit
                        Came up missing.

Stevens:                I'd like to see, read, see that motion for
                        Discovery.

{¶133} At this point, Stevens lowers his voice.

Myers:                  Let's do it man, like to make some money.
                        Know someone who wants hoe.  We can
                        Make money off it.

Stevens:                I'll give you a call this evening.

{¶134} The State was required to prove that Stevens acted "with purpose to commit in the structure * * * any criminal act."  Stevens' defense was that there was no evidence beyond a reasonable doubt on the elements of the charge.  Thus, Stevens' intent is at issue.  Did Stevens mastermind the burglaries and was he complicit in the commission of the crew's crimes, or rather were the burglaries completed solely by the crew, with no culpability on behalf of Stevens?  The State asserts that the above evidence was

admissible to prove Stevens' identity, scheme, or plan in committing the charged offenses.

{¶135} Based upon our de novo review, we find that the trial court did not err in admitting evidence of the discussion about stealing a backhoe. Myers testified earlier that he performed criminal acts on behalf of Stevens. On the recorded statement, Myers mentions that he knows someone who wants a backhoe and they can "make some money." Stevens replies that he will call him later. The testimony about the backhoe is relevant because it demonstrates another criminal scheme in which Stevens is involved. Offered for this reason, it is a legitimate purpose. Furthermore, we do not find its probative value is substantially outweighed by any unfair prejudice.[12]

{¶136} Myers testified earlier in trial that the burner phones were changed out every 30-40 days so they could not be used as evidence. Stevens' statement that he let his burner phones "run out" is also relevant evidence. The evidence was offered for the same legitimate purpose as above, to demonstrate a common plan or scheme. We do not find the

---

[12]*See  State v. Collins*, 6th Dist. Wood No. WD-84-5, 1984 WL 14329, (July 27, 1984), at *2, (Evidence that opening in garage door was made by a prior break-in was highly probative in light of appellant's claim of coincidence in stopping at exact spot when numerous and more accessible sites were available for servicing of truck and as purpose to commit a theft is a key element of charge of breaking and entering, admission of evidence of the prior break-in was properly granted by trial court.)

probative value of this evidence is substantially outweighed by any unfair prejudice.[13]

{¶137} Stevens asked Myers to follow him to a different location and indicated he did not want his family to know of his activities. He further stated he did not want to be seen in public with Myers. This evidence suggests Stevens hid his criminal activities from his family. Stevens' counsel elicited testimony from the victim, Robbie Davis, of Stevens' kindness and goodness to others. He testified Stevens donated to others and "had a big heart." In closing arguments, Stevens counsel asked the jury to acquit Stevens and restore him to dignity.

{¶138} The testimony that Stevens hid his activities and did not want to be seen with Myers, a known criminal, is relevant because it contradicts the defense's evidence. Stevens was convicted as a complicitor. The testimony of Myers demonstrated that Stevens directed others to do criminal acts, presumably in part not to tarnish his own reputation. This

---

[13]*See State v. Curry*, 4th Dist. Scioto No. 95CA2330, 1997 WL600056, at 5. (Citing *Wilkinson*, evidence concerning other facts which form part of the immediate background of an alleged act which forms the foundation of the crime charged is admissible); *State v. Carpenter,* 12th Dist. Butler No. CA2019-03-044, 2019-Ohio-4829, at ¶ 41, (Testimony that appellant kept his narcotics in gas tank was extrinsic to the crime charged, probative of appellant's identity, preparation and plan, and would be admissible under Evid.R. 404(B).)

evidence has the legitimate purpose of contradicting the defense's theory.

Its probative value is not substantially outweighed by unfair prejudice.[14]

{¶139} The testimony about Chubb was properly excluded at trial so that argument herein has become moot.

{¶140} We find that the testimony that Myers dreaded getting into the vehicle with Stevens, presumably because he feared violence, is not relevant. Stevens was not charged with a violent crime. The only value of the testimony would be to show that Stevens had a propensity for violence. Similar testimony about Chubb was excluded. This testimony should have been excluded as well. However, as discussed above at length in Assignment of Error Two, there was ample other evidence of Stevens' guilt. Thus, we cannot say the admission of this evidence constituted unfair prejudice or affected the outcome of the trial.

{¶141} We further note that the trial court gave the following instruction at closing:

> Evidence was received about the commission of other crimes or wrongs other than the offenses with which the defendant is charged in this trial. It was not received, and you may not consider it to provide the character of the defendant in order to show that he acted in conformity with that character. If you find that the evidence of other

---

[14]*State v. Ash,* 7th Dist. Monroe No. 16MO0002, 2018-Ohio-1139, at ¶ 66, (Testimony confirming that relationship was "tumultuous" and "strained" immediately before victim went missing constituted the immediate background of offense, was relative to motive, and relative to identity).

crimes or wrongs are true and that the defendant committed them, you may consider that evidence only for the purpose of deciding whether it proves motive or knowledge of the circumstances surrounding the offense charged in this trial. That evidence cannot be considered for any other purposes.

{¶142} We presume that the jury followed the trial court's instructions.

{¶143} Based on the foregoing, we find no merit to Stevens' fourth assignment of error. Accordingly, it is hereby overruled.

{¶144} Having found no merit to any of Stevens' assignments of error, the judgment of the trial court is affirmed.

**JUDGMENT AFFIRMED.**

**<u>JUDGMENT ENTRY</u>**

It is ordered that the JUDGMENT BE AFFIRMED and costs be assessed to Appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Hocking County Common Pleas Court to carry this judgment into execution.

<u>IF</u> A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued

stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Hess, J., & Wilkin, J.: Concur in Judgment & Opinion.

For the Court,

_____

Jason P. Smith
Presiding Judge

**NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**